David BATEMAN, Richard Dobson, Paul Tarbox, as General Partners in Dictar Associates II, and Dictar Associates, Inc., Plaintiffs/Counterclaim Defendants,

v.

FEDERAL DEPOSIT INSURANCE CORPORATION, Defendant.

NEW MAINE NATIONAL BANK, Counterclaim Plaintiff,

v.

MAINE SAVINGS BANK, Everett N. Dobson & Sons, Inc., and 335 Forest Avenue Associates, Parties-in-Interest.

No. 91–0038–P.

United States District Court, D. Maine.

June 10, 1991.

Martha C. Gaythwaite, Freidman & Babcock, Thomas F. Monaghan, Monaghan, Leahy, Hochadel & Libby, Portland, Me., for plaintiffs/counterclaim defendants.

William J. Kayatta, Jr., Pierce, Atwood, Scribner, Allen, Smith & Lancaster, Portland, Me., for New Maine Nat. Bank.

George F. Burns, Amerling & Burns, Portland, Me., for Everett N. Dobson & Sons, Inc.

Mark G. Furey, Thompson, MacNaboe, Ashley & Bull, Portland, Me., for Maine Sav. Bank.

MEMORANDUM OF DECISION AND ORDER ON COUNTERCLAIM PLAINTIFF NEW MAINE NATIONAL BANK'S MOTION FOR SUMMARY JUDGMENT

GENE CARTER, Chief Judge.

Plaintiffs'/Counterclaim Defendants' (hereinafter Counterclaim Defendants) claims against the Federal Deposit Insurance Corporation (hereinafter FDIC) have been dismissed pursuant to the directives on jurisdiction contained in 12 U.S.C. section 1821(d)(3), (5), (6), and (13)(D). Several counterclaims by New Maine National Bank (hereinafter NMNB) remain, and are the subject of this summary judgment motion. The Court will grant NMNB's motion for summary judgment for the reasons discussed below.

## I. FACTS AND SUMMARY JUDGMENT STANDARD

A motion for summary judgment must be granted if:

> the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). It is not sufficient to show merely that there exists an alleged dispute about the facts. The nonmoving party must show that there is a *genuine* issue of *material* fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). The Court of Appeals for the First Circuit has elaborated on this standard:

> [T]he movant must adumbrate 'an absence of evidence to support the nonmoving party's case.' *Celotex Corp. v. Catrett*, 477 U.S. 317 [106 S.Ct. 2548, 91 L.Ed.2d 265] (1986). When that is accomplished, the burden shifts to the opponent to establish the existence of a fact issue which is both 'material,' in that it might affect the outcome of the litigation, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 [106 S.Ct. 2505, 2510, 91 L.Ed.2d 202] (1986); *Hahn v. Sargent*, 523 F.2d 461, 464 (1st Cir.1975), *cert. denied*, 425 U.S. 904 [96 S.Ct. 1495, 47 L.Ed.2d 754] (1976), and 'genuine,' in that a reasonable jury could, on the basis of the proffered proof, return a verdict for

the opponent. *Anderson,* 477 U.S. at 248 [106 S.Ct. at 2510]. It is settled that the nonmovant may not rest upon mere allegations, but must adduce specific, provable facts demonstrating that there is a triable issue. 'The evidence illustrating the factual controversy cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve at an ensuing trial.' *Mack v. Great Atlantic and Pacific Tea Co.,* 871 F.2d 179, 181 (1st Cir.1989). As the Supreme Court has said:

> [T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.

*Anderson,* 477 U.S. at 249–59, 106 S.Ct. at 2511.

*Brennan v. Hendrigan,* 888 F.2d 189, 191–92 (1st Cir.1989) (quoted in *MCI Telecommunications Corp. v. Franklin–Centennial Corp.,* 128 F.R.D. 158, 158–59 (D.Me. 1989)).

Counterclaim Defendants are Dictar Associates, Inc. (hereinafter Dictar, Inc.), a corporation; Dictar Associates II (hereinafter Dictar II), a general partnership; and David Bateman, Richard Dobson, and Paul Tarbox, the general partners of Dictar II. Counterclaim Plaintiff NMNB is a "bridge bank" chartered pursuant to 12 U.S.C. section 1821(n) which acquired the assets of Maine National Bank (hereinafter MNB) when that institution was placed in receivership by the FDIC on January 6, 1991.[1] Included among those assets are the counterclaims which are the subject of the present motion. The undisputed facts underlying these counterclaims are as follows.[2]

On or about November 18, 1986, Dictar II executed and delivered to MNB a promissory note in the amount of $4,730,000 (hereinafter Country Club Note) and a promissory note in the amount of $5,700,-000 (hereinafter Subdivision Note). These two promissory notes supported construction loans to finance the development of a country club and single family house lots in Falmouth, Maine. Dictar II also executed and delivered to MNB on that day a mortgage and security agreement (hereinafter First Mortgage) which secured these two notes by conveying certain real property in Falmouth and Cumberland, Maine. The First Mortgage was recorded in the Cumberland County Registry of Deeds. On August 15, 1988, Dictar II executed and delivered to MNB a Supplemental Mortgage which conveyed additional real property in Falmouth and Cumberland[3] as further security for the Country Club Note and the Subdivision Note. The Supplemental Mortgage was also recorded. With the exception of a tax lien in favor of the Town of Falmouth, all other alleged liens and encumbrances on this property are subordinate to the Supplemental Mortgage.

On or about December 23, 1988, Dictar Inc. executed and delivered to MNB an

---

**1.** MNB was declared insolvent on January 6, 1991. The FDIC was appointed receiver of MNB on that day pursuant to 12 U.S.C. sections 191 and 1821(c). The FDIC assumed MNB's liabilities, including the claims which were recently dismissed pending exhaustion of congressionally mandated administrative procedures. *See* 12 U.S.C. § 1821(d)(6), (7), (8).

**2.** Counterclaim Defendants and Party-in-Interest Everett N. Dobson & Sons, Inc., the nonmoving parties herein, have each submitted Statements of Material Facts, as required by Local Rule 19, and each of these statements is supported by either affidavits or evidentiary quality submissions. However, these statements do not contest the facts set forth in the statement submitted by NMNB. Similarly, NMNB's Statement of Material Facts does not address many of the facts set forth in the statements submitted by Counterclaim Defendants and Party-in-Interest Everett N. Dobson & Sons, Inc. In the absence of any express indication of disagreement between the parties in these statements or the presence of manifestly conflicting evidence in the record, the Court concludes that no genuine dispute exists with respect to any of the facts set forth in the statements.

**3.** This property originally had been included in the First Mortgage, but was subsequently released by MNB and made the subject of this separate agreement.

Advancing Demand Note.[4] MNB represented to Counterclaim Defendants in December 1988 that the Advancing Demand Note would be administered consistent with the course of dealing established by the parties in the administration of the earlier loans. MNB also represented that the loans would be renewed in the fall of 1989 upon the submission by Dictar Inc. of updated financial statements. During the spring of 1989, MNB's loan officer met with Dictar Inc.'s principals on several occasions to discuss the adequacy of the financing provided for the Falmouth construction projects. In response to a request from the loan officer, Dictar Inc. submitted a comprehensive written loan analysis discussing the status of the Falmouth project, and the viability and proposed terms of a supplemental loan. The analysis adopted MNB's suggestion of tying the Advancing Demand Note to the construction loans for the Falmouth project (*i.e.*, the Country Club Note and the Subdivision Note), since the line of credit made available by the Advancing Demand Note had been used to service the Country Club and Subdivision Notes.

Subsequently, MNB advised Dictar Inc. that $1.5 million in cash reserves would be necessary to continue the Falmouth projects and that a loan agreement for that sum should be adopted. Acting on the foregoing analysis and advice, MNB issued a commitment letter on June 2, 1989 agreeing to lend an additional $1 million to Dictar II. MNB represented that this loan would be administered consistent with the past practice between the parties. Counterclaim Defendants Dictar II, Dobson, Tarbox, and Bateman executed and delivered to MNB on September 12, 1989 a promissory note in the amount of $1,000,-000 (hereinafter 1989 Note) and a mortgage, security agreement, and fixture filing (hereinafter Second Mortgage) securing the 1989 Note. The Second Mortgage, which was recorded, conveyed properties located in Falmouth and Cumberland, which subsequently were subjected to subordinate liens and encumbrances, along with superior tax liens in favor of the Town of Falmouth. In addition, MNB agreed that payment would be provided from the proceeds of sales of house lots in the Falmouth projects. On or about September 21, 1989, Dictar Inc. executed and delivered to MNB a term note in the amount of $250,000 (hereinafter Term Note) which replaced an earlier promissory note in the same principal amount. On or about September 25, 1989, the $1 million loan evidenced by the 1989 Note was closed.

Soon thereafter, MNB's loan officer represented both that the Term Note would be left in place for two years if a satisfactory appraisal of the Falmouth property were obtained, and that Dictar Inc. would not have to revisit the issue of financing for the next two years. On November 10, 1989, an appraisal of the property was provided to MNB showing a fair market value for the property of $560,000. MNB's loan officer represented that this appraisal was more than sufficient to allow the loan to remain in place for the next two years. No action was taken by MNB with respect to the Term Loan after the maturity date of the note which suggested any intent not to renew, and Dictar Inc. continued to make timely payments. Dictar Inc. provided to MNB in January 1990 a complete synopsis of its holdings and operations. This synopsis listed the maturity date of the Term Note as November 1991, consistent with Dictar Inc.'s understanding of its agreement with MNB. There was no further communication between MNB and Dictar Inc. and its agents until March 13, 1990, when demands for payment on the various obligations were made.

Dictar Inc. is now in default of both the Term Note and the Advancing Demand Note. MNB made a demand for payment of these notes on March 13, 1990 to which Counterclaim Defendants have not responded. NMNB is owed $500,000 principal on the Advancing Demand Note, along with $18,697.92 in interest accrued as of March 1, 1991, and additional interest accruing at the daily rate of $135.42. NMNB is owed $249,000 principal on the Term

---

**4.** This Advancing Demand Note apparently provided Dictar Inc. with a $500,000 line of credit.

Note, along with $9,715.53 in interest accrued as of March 1, 1991, with additional interest accruing at the daily rate of $69.17. In addition, NMNB is entitled to reasonable attorneys' fees for the collection of these obligations. Counterclaim Defendants Dobson, Tarbox, and Bateman each executed and delivered to MNB on two occasions guaranties which guaranteed the Term Note and the Advancing Demand Note. Dictar II and 335 Associates also executed guaranties which unconditionally guaranteed the Advancing Demand Note. These guarantors, who are jointly and severally liable for the obligations, are now in default of their guaranties.

Dictar II is also in default of both the Country Club Note and the Subdivision Note. In addition, the Country Club Note matured on November 18, 1990 and is, by its terms, past due and owing. Dictar II has also breached the conditions of both the First Mortgage and the Supplemental Mortgage. MNB made a demand for payment on March 13, 1990 and accelerated the Country Club Note and the Subdivision Note.[5] NMNB is owed $1,960,000 principal on the Country Club Note, along with $232,697.88 in interest accrued as of March 1, 1991, with additional interest accruing daily at the rate of $550.14. NMNB is owed $3,427,902.54 principal on the Subdivision Note, along with $395,070.02 in interest accrued as of March 1, 1991, with additional interest accruing daily at the rate of $962.63.

Counterclaim Defendants Dictar II, Dobson, Tarbox, and Bateman are in default of the 1989 Note and have breached the Second Mortgage. MNB made a demand for payment on March 13, 1990 to which Counterclaim Defendants have not responded. NMNB is owed $250,924.49 principal on the 1989 Note, along with $63,048.24 in interest accrued as of March 1, 1991, with additional interest accruing at the daily rate of $70.47. Further, NMNB is entitled to reimbursement of reasonable attorneys' fees and related costs associated with the collection of all of the notes.

Counterclaim Defendants Dobson, Tarbox, Bateman, and Dictar Inc., and Party-in-Interest 335 Forest Avenue Associates (hereinafter 335 Associates) each individually executed and delivered to MNB a guaranty which unconditionally guaranteed payment of the Country Club Note, the Subdivision Note, and the 1989 Note. These guarantors, who are jointly and severally liable for the obligations guaranteed, are now in default of each of their guaranties. In addition, 335 Associates executed and delivered to MNB a mortgage, security agreement, and fixture filing (hereinafter 335 Mortgage) on September 12, 1989, securing the guaranties provided by 335 Associates in support of the Country Club Note, the Subdivision Note, and the 1989 Note. The 335 Mortgage was recorded, and all liens and encumbrances on the conveyed property are subordinate to the 335 Mortgage. The 335 Mortgage was breached as a consequence of 335 Associates' default on their guaranty.

On November 16, 1991, Dictar Inc. and its principals initiated this litigation based on the various alleged representations made and agreements entered into by MNB and claiming breach of contract, breach of the implied covenant of good faith and fair dealing, breach of fiduciary duty, promissory estoppel, and negligent misrepresentation. Each of these claims now sounds against the FDIC and has been dismissed pending exhaustion of the mandated administrative claims procedure. Counterclaim Defendants have also asserted, however, that MNB's representations to and agreements with Counterclaim Defendants are effective defenses to NMNB's efforts to collect the outstanding obligations from them either as principal debtors or as guarantors.

Completely independent of the representations and agreements between MNB and Counterclaim Defendants is an alleged mechanics' lien on the property in Falmouth in favor of Party-in-Interest Everett N. Dob-

---

5. There is no apparent dispute in the record that Dictar II made timely monthly payments prior to March 13, 1990.

son & Sons, Inc. (hereinafter Dobson & Sons). Dobson & Sons supplied materials and labor for construction of the Falmouth project through late September 1990 with the assessed value of $1,262,881. MNB allegedly had full knowledge of the work provided by Dobson & Sons. Dictar Inc. has failed to pay any of the money due to Dobson & Sons. On November 7, 1990, Dobson & Sons filed a lien certificate in the Registry of Deeds for Cumberland County stating the amount due from Dictar Inc. On December 19, 1990, Dobson & Sons filed a civil action to enforce its mechanics' lien rights. Dobson & Sons argues that summary judgment is inappropriate because there is a genuine issue with respect to the relative priorities of NMNB's notes and mortgages and Dobson & Sons' mechanics' lien.

## II. DISCUSSION

In the absence of the oral representations and oral agreements between MNB and Counterclaim Defendants, there is no genuine issue of material facts as to the joint and several liability of Counterclaim Defendants Dobson, Tarbox, Bateman, and Dictar Inc. for the full value of the Country Club Note, the Subdivision Note, the 1989 Note, the Term Note, and the Advancing Demand Note, along with all interest and reasonable attorneys' fees. Further, there is no genuine issue of material fact, independent of the representations and agreements, as to the joint and several liability of Counterclaim Defendant Dictar II and Party-in-Interest 335 Associates for the full value of the Country Club Note, the Subdivision Note, the 1989 Note, and the Advancing Demand Note. The only question is whether the oral representations and oral agreements are material (*i.e.*, potentially effective defenses) to the ultimate issue of Counterclaim Defendants' liability for these obligations.

■ Fifty years ago, the Supreme Court established a common law estoppel doctrine which prohibits defendants from using "secret agreements" to defend against efforts by the FDIC to collect on notes it has acquired from a failed bank. *See D'Oench,*

*Duhme & Co. v. FDIC,* 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942). Agreements which fit within the broad confines of the following test may not be asserted as defenses:

> The test is whether the note was designed to deceive the creditors or the public authority, or would tend to have that effect. It would be sufficient in this type of case that the maker lent himself to a scheme or arrangement whereby the banking authority on which respondent relied in insuring the bank was or was likely to be misled.

*Id.* at 460, 62 S.Ct. at 681. The purpose of this doctrine is to protect the FDIC from "misrepresentations and secret agreements which might result in it incorrectly assessing the value of bank holdings for institutions which it insures, makes loans, or acquires in its corporate capacity." *FDIC v. P.L.M. International Inc.,* 834 F.2d 248, 252 (1st Cir.1987). Consistent with this purpose, the *D'Oench* doctrine does not require a showing that the defendant has an intent to defraud. *Id.* at 252–53. The only element of fault necessary to the invocation of the common law *D'Oench* doctrine is the borrower's failure to reduce the agreement to writing. *Timberland Design, Inc. v. First Service Bank for Savings,* 932 F.2d 46, 49 (1st Cir.1991).

■ The applicability of the common law *D'Oench* doctrine is not limited to the FDIC in its corporate capacity as the insurer of a failed institution's deposits. The FDIC may also assert the doctrine in its role as the receiver of a failed institution, *id.* at 49, and bridge banks may assert the doctrine as the assignees of the FDIC as the receiver of a failed institution. *Kilpatrick v. Riddle,* 907 F.2d 1523, 1528 (5th Cir.1990).

The *D'Oench* doctrine is no longer strictly a common law edict. Section 13(e) of the Federal Deposit Insurance Act of 1950 and section 214(a) of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 both incorporated and clarified the doctrine. *See* 12 U.S.C. §§ 1823(e), 1821(n)(4)(I). Section 1821(n), which is directly applicable to this case, reads in full:

(I) no agreement which tends to diminish or defeat the right, title or interest of a bridge bank in any asset of an insured bank in default acquired by it shall be valid against the bridge bank unless such agreement—

(i) is in writing,

(ii) was executed by such insured bank in default and the person or persons claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by such insured bank in default,

(iii) was approved by the board of directors of such insured bank in default or its loan committee, which approval shall be reflected in the minutes of said board or committee, and

(iv) has been, continuously from the time of its execution, an official record of such insured bank in default.

12 U.S.C. § 1821(n)(4)(I). The Supreme Court, expanding on its earlier work in *D'Oench*, gave a very broad definition to the "agreements" which must meet the four requirements of this statutory estoppel doctrine:

Certainly, one who signs a facially unqualified note subject to an unwritten and unrecorded condition upon its repayment has lent himself to a scheme or arrangement that is likely to mislead banking authorities, whether the condition consists of performance of a counterpromise (as in *D'Oench, Duhme*) or of the truthfulness of warranted fact.

*Langley v. FDIC*, 484 U.S. 86, 92–93, 108 S.Ct. 396, 402, 98 L.Ed.2d 340 (1987).[6] There can be no doubt that the representations and agreements upon which Counterclaim Defendants rely for their defenses fit comfortably within this definition.

■ Thus, in order to defeat this motion for summary judgment, Counterclaim Defendants must demonstrate that there is a genuine issue with respect to the oral representations made and the oral agreements entered into by MNB as to the existence of *all* of the statutory requirements for agreements enforceable against bridge banks. *See FDIC v. Caledonia Investment Corp.*, 862 F.2d 378, 383 (1st Cir. 1988). But Counterclaim Defendants cannot satisfy the burden which has shifted to them. The Court need go no further than the requirement of a writing to find that Counterclaim Defendants may not employ these representations and agreements to establish defenses to NMNB's collection of the money due under the various notes and other obligations. Counterclaim Defendants neither allege nor offer any evidence which suggests the existence of any writing with respect to any of these representations and agreements. As a result, both the common law *D'Oench* doctrine and the statutory provisions which incorporate and clarify that doctrine estop Counterclaim Defendants from asserting the only defenses they have effectively raised against NMNB's counterclaim.[7]

■ Counterclaim Defendants also argue that the *D'Oench* doctrine should not apply in these circumstances since the FDIC, and NMNB as its assignee, had actual knowledge of the oral representations and oral agreements. Putting aside Coun-

---

6. *Langley* involved the interpretation of section 1823(e) which, by its terms, applied only to the FDIC. However, the language of sections 1823(e) and 1821(n)(4)(I) are virtually identical. Any governing interpretation of the former undoubtedly governs construction of the latter.

7. Counterclaim Defendants pleaded the following defenses: prior breach of contract, estoppel, unclean hands, duress, failure of consideration, waiver, laches, and accord and satisfaction. With the exception of the last two defenses, the *D'Oench* doctrine estops the assertion of all these defenses. Further, Counterclaim Defendants have not offered any argument or evidence in support of their assertions of laches and accord and satisfaction. Accordingly, the Court considers these defenses to have been waived. *See Carey v. Maine School Administrative District # 17*, 754 F.Supp. 906, 924 (D.Me. 1990) (Carter, C.J.).

Similarly, Counterclaim Defendants suggest that lurking in the penumbra somewhere in the vicinity of the *D'Oench* doctrine are constitutional issues associated with the contracts clause and the due process clause. Yet, Counterclaim Defendants have not provided the Court with any developed argumentation on these issues. The Court will not speculate as to the substance of these constitutional arguments and considers them also to have been waived. *See id.*

terclaim Defendants' failure to evince any evidence supporting this allegation, the actual knowledge of the FDIC and NMNB is not material. The only inquiry is whether the representations would tend to mislead the public authority. *Langley,* 484 U.S. at 95, 108 S.Ct. at 403; *Timberland Design,* 932 F.2d at 50. Finally, Counterclaim Defendants argue that the *D'Oench* doctrine should not apply to these notes because they are variable rate instruments which necessarily incorporate side agreements. The Court holds that neither the common law *D'Oench* doctrine nor the statutory doctrine recognize a distinction based on the content of the notes which the FDIC or bridge bank is seeking to enforce.

■ The argument advanced by Party-in-Interest Dobson & Sons must also fail under the weight of the common law *D'Oench* doctrine and section 1821(n)(4)(I). The only issue generated by Dobson & Sons' objection to this motion is whether Dobson & Sons' mechanics' lien is entitled to priority over the various instruments owned by NMNB.[8] Dobson & Sons argues that its mechanics' lien is not governed by the *D'Oench* doctrine because the lien is not being asserted by a borrower. As a result, Dobson & Sons argues that it is entitled to the statutory priority guaranteed to mechanics' lienors by Maine law. *See* 10 M.R.S.A. § 3251 *et seq.* But the plain language of the governing statutory provisions does not evidence any distinction between borrowers and nonborrowers of the kind suggested. Section 1821(n)(4) is clear and unequivocal: *"no agreement* which tends to diminish or defeat the right, title or interest of a bridge bank in any asset of an insured bank in default acquired by it shall be valid...." 12 U.S.C. § 1821(n)(4)(I) (emphasis added). All agreements which would tend to diminish or defeat the right, title or interest of NMNB in these notes and obligations are governed by the common law *D'Oench* doctrine and the relevant statutory provisions.

Dobson & Sons' mechanics' lien is dependent upon the existence of a contract or implied contract between Counterclaim Defendants and Dobson & Sons. *See Bangor Roofing & Sheet Metal Co. v. Robbins Plumbing Co.,* 151 Me. 145, 116 A.2d 664, 666 (1955) ("The lien is incident and security to a legal liability to pay"). This contract—namely, payment in exchange for construction work—is the agreement to which the Court must look to determine whether the requirements of the statute are satisfied. The agreement is well within the *Langley* Court's definition of those "agreements" which must conform to the requirements of section 1821(n)(4): "a scheme or arrangement that is likely to mislead banking authorities...." 484 U.S. at 92–93, 108 S.Ct. at 402. Thus, Dobson & Sons must demonstrate that there exists a genuine issue with respect to the existence of all four of the requisite elements for an agreement enforceable against a bridge bank.

Dobson & Sons offers no evidence of a writing executed by MNB addressing the construction agreement between Counterclaim Defendants and Dobson & Sons. In the absence of such an executed writing, the agreement underlying the mechanics' lien cannot meet the requirements of section 1821(n)(4)(I). As a result, Dobson & Sons is estopped from asserting the mechanics' lien as a defense or an affirmative claim against NMNB. *Timberland Design,* 932 F.2d at 49 (the *D'Oench* doctrine applies both to defenses and affirmative claims).

In summary, Counterclaim Defendant Dictar II and Party-in-Interest 335 Associates are jointly and severally liable to NMNB, either as debtors or guarantors, for the following obligations in the following amounts: Country Club Note—$1,960,000 principal, $232,697.88 accrued interest (as of March 1, 1991), and $550.41 interest accruing daily (since March 1, 1991); Subdivision Note—$3,427,902.54 principal, $395,070.02 accrued interest (as of March 1, 1991), and $962.63 interest accruing daily (since March 1, 1991); 1989 Note—$250,924.49 principal, $63,048.24 accrued inter-

**8.** The Court is not presented with any question arising from the alleged debt owed by Counterclaim Defendants to Dobson & Sons, and therefore expresses no opinion on that subject.

1202

est (as of March 1, 1991), and $70.47 interest accruing daily (since March 1, 1991); and Advancing Demand Note—$500,000 principal, $18,697.92 accrued interest (as of March 1, 1991), and $135.42 interest accruing daily (since March 1, 1991). Counterclaim Defendants Dictar Inc., Dobson, Tarbox, and Bateman are jointly and severally liable to NMNB for each and every one of the above listed obligations, as well as being jointly and severally liable for the Term Note, on which is owed $249,000 principal, $9,715.53 accrued interest (as of March 1, 1991), and $69.17 interest accruing daily (as of March 1, 1991).

Accordingly, the Court hereby GRANTS the motion for summary judgment of Counterclaim Plaintiff New Maine National Bank. Counterclaim Plaintiff's counsel shall propose an order entering final judgment in accordance with the foregoing order on or before June 17, 1991.

So ORDERED.