### CENTEX–SIMPSON CONSTRUCTION COMPANY, INC., Plaintiff,

v.

### FIDELITY & DEPOSIT COMPANY OF MARYLAND, Defendant & Third–Party Plaintiff

and

### The Fels Company, Inc., Defendant,

and

### Federal Deposit Insurance Corporation, Defendant,

and

### Donald Gleason and Cynthia Luce, Third–Party Defendants.

### Civ. No. 91–0068–P–C.

United States District Court, D. Maine.

May 26, 1992.

---

Rick E. Lawrence, Pierce, Atwood, Scribner, Allen, Smith & Lancaster, Portland, Me., for defendant F.D.I.C.

George F. Burns, Amerling & Burns, Portland, Me., for plaintiff Centex–Simpson.

Jon S. Oxman, Linnell, Choate & Webber, Auburn, Me., for defendant & third-party plaintiff Fidelity & Deposit.

Peter J. Detroy, III, Norman, Hanson & Detroy, Portland, Me., for third-party defendant Gleason.

## OPINION AND ORDER ON STIPULATED RECORD

GENE CARTER, Chief Judge.

This case involves an interpleader action initiated by Centex–Simpson Construction Company, Inc. ("Plaintiff" or "Centex") against Fidelity & Deposit Company of Maryland ("Fidelity"), The Fels Company, Inc. ("Fels"), and the Federal Deposit Insurance Corporation ("FDIC").[1] Fidelity filed on

---

1. On January 6, 1991, Maine National Bank (hereinafter "MNB") was declared insolvent and the FDIC was appointed its receiver on that date pursuant to 12 U.S.C. sections 191 and 1821(c). Thereafter, New Maine National Bank (hereinafter "NMNB") was created and chartered to perform the function of a "bridge bank" under the statutory format. On July 11, 1991, NMNB was declared insolvent by the FDIC. On July 13, 1991, the FDIC was appointed Receiver of NMNB by the Controller of the Currency. As Receiver, the FDIC has succeeded to all rights, title, powers, and privileges of NMNB pursuant to 12 U.S.C. section 1821(d)(2)(A)(i). By Order

March 25, 1991, a counterclaim against Centex, cross-claims against Fels and the FDIC, and a third-party claim against Donald and Cynthia Gleason. NMNB filed a counterclaim against Centex on March 27, 1991.

The parties originally submitted motions for summary judgment but, during a pre-trial conference held on December 18, 1991, at the suggestion of the Court, *see Boston Five Cents Savings Bank v. Secretary of Department of Housing and Urban Development,* 768 F.2d 5, 11–12 (1st Cir.1985), they agreed to submit cross-motions for judgment on a stipulated record. On January 24, 1992, Centrex, Fidelity, and the FDIC submitted to the Court their cross-motions and the stipulated record.[2] This procedural device requires the Court to decide the case on its merits, based on the stipulated record. For the reasons that follow, the Court finds that Fidelity is entitled to the interpleaded funds.

## I.

On May 2, 1983, Fels executed and delivered to MNB a security agreement that provided MNB with a security interest in Fels' accounts receivable. *See* S.R., Joint Exhibit A. MNB perfected its security interest in Fels' accounts receivable by filing financing and continuation statements under 11 M.R.S.A. sections 9–302, 401 with the Maine Secretary of State on May 4, 1983, and March 9, 1988. *See* S.R., Joint Exhibits B–C. MNB made several loans to Fels, which were secured in part by the security agreement, including loans of $50,000 on January 21, 1987; $150,000 on March 19, 1987; $200,000 on October 29, 1987; and $1,200,000 on August 25, 1989.[3]

On September 29, 1988, Fels, as subcontractor, entered into a subcontract with Centex, the general contractor, to perform mechanical work in connection with a federal construction project at the Veterans Administration Medical/Regional Office Center ("VA") in Togus, Maine. On the same date, Fidelity, as surety, issued to Centex payment and performance bonds required by the Miller Act, 40 U.S.C. section 270(a) *et seq.,* as obligee, to cover the subcontract obligations of Fels, as principal, in connection with the project.[4] *See*

---

of this Court, the FDIC was substituted for the NMNB as Defendant and Counterclaim Plaintiff in this case.

The parties in the present case are restricted to the FDIC and Fidelity, each of whom claims it is entitled to the interpleaded funds. Fels has never made any claim in this interpleader action to the $90,713.32 deposited with the Clerk of this Court or to any other funds due it on account of the subcontract between Centex and Fels. *See* Stipulated Record ("S.R."), ¶ 62.

With respect to the Third–Party Defendants, Donald G. Gleason and Cynthia Luce (Gleason), Donald Gleason has filed in bankruptcy, and the automatic stay arising out of said filing continues in force. *See* Addition to Stipulated Record ("A.S.R."), ¶ B. If the interpleaded funds are adjudged payable to other than Fidelity, Fidelity shall have judgment for indemnification against Cynthia Luce (Gleason) for the amount of such funds, plus interest and costs as provided by law. *Id.,* ¶ E.

**2.** After its review of the initial record, the Court conferred with counsel on April 30, 1992, concerning the supplementation of the record herein. As a result, an Addition to Stipulated Record was filed on May 11, 1992. *See* Docket No. 64.

**3.** On February 1, 1988, Fels and Donald and Cynthia Gleason executed an Agreement of Indemnity to the advantage of Fidelity & Deposit Co. of Maryland ("Fidelity") in which they agreed to indemnify Fidelity for all losses or expenses which Fidelity might incur in connection with surety bonds procured by Fels.

**4.** Since a federal construction project was involved, the Miller Act applied to the project in question here. The Miller Act provides:

Before any contract, exceeding $25,000 in amount, for the construction, alteration, or repair of any public building or public work of the United States is awarded to any person, such person shall furnish to the United States the following bonds, which shall become binding upon the award of the contract to such person, who is hereinafter designated as "contractor":

(1) A performance bond with a surety or sureties satisfactory to the officer awarding such contract, and in such amount as he shall deem adequate, for the protection of the United States.

(2) A payment bond with a surety or sureties satisfactory to such officer for the protection of all persons supplying labor and material in the prosecution of the work provided for in said contract for the use of each such person.

40 U.S.C. § 270(a).

A.S.R., ¶ C; S.R., Joint Exhibits D–E. Such bonds were required by the subcontract between Centex and Fels.

On or about January 18, 1991, NMNB provided Centex with written notice of (a) the bank's security interest in all accounts receivables of Fels, (b) Fels' default on its obligations to the bank and (c) the bank's entitlement to all amounts due and owing from Centex to Fels.[5] As Receiver for NMNB, the FDIC is the holder of a judgment in the amount of $1,296,059.03, plus interest, against Fels obtained in an action brought by NMNB for Fels' default on the four loans from the bank secured, in part, by Fels' accounts receivable.

As of January 6, 1991, Fels owed substantial sums to its suppliers of labor and materials in connection with the construction project.[6] On January 24, 1991, Centex notified Fels by letter that it had defaulted on its subcontract obligations. Fels had failed to complete all of the work described in that letter. *See* S.R., Exhibit J.

On February 27, 1991, Centex deposited with the Clerk of this Court $90,713.32,[7] and commenced an interpleader action, requesting that the Court determine ownership of the funds in question. Thereafter, on the same date, Fels notified Centex that it had "improperly forced [it] into default due to lack of payment. As a result, [it] terminated [its] work force as of 3:30 PM th[at] date." S.R., Joint Exhibit O. On March 1, 1991, Centex terminated Fels' right to proceed under the subcontract. Centex hired another company as a substitute subcontractor to complete the mechanical work.

As surety for Fels, Fidelity has paid Centex $422,911.62 pursuant to its performance bond obligations to reimburse Centex for payments made to complete the mechanical work on the project. Fidelity, however, has withheld $90,713.32, the amount of the interpleaded funds, from the funds that were due either Centex or Fidelity for the purpose of completing the mechanical subcontract. In addition, Fidelity has paid $214,446.04 pursuant to its payment bond obligations to those who supplied labor and materials to Fels in connection with the project.[8]

Fels has never made any claim in the interpleader action to the $90,713.32 or to any other funds due to it on account of the subcontract between Centex and Fels. Moreover, Fels has never received any judgment entitling it to the $90,713.32 or to any other funds, based on this subcontract. The current dispute over the ownership of this fund is strictly one between Fidelity and the FDIC as Receiver of NMNB.

## II.

The crux of this dispute between Fidelity and the FDIC regarding the ownership of the interpleaded fund turns on whether Fels ever acquired title to the $90,713.32. Fidelity argues that title to the fund never passed to Fels because Fidelity became entitled to it, based on its surety relationship to Fels and its right of subrogation that arose in "investing hundreds of thousands of dollars to effect performance of the mechanical work." Reply Memorandum of Law of Fidelity in Support of its Motion for Judgment on a Stipulated Record at 1–2. The FDIC argues that the "security interest acquired by the Bank ... is the tangible asset which the *D'Oench, Duhme* doctrine is intended to protect." Reply Memorandum of Law of Defendant FDIC at 3. Furthermore, it asserts that the interpleaded funds are part of that asset because they constitute a portion of the payments owed to Fels by Centex for work performed by Fels. *Id.* The FDIC concludes that the agreements related to Fidelity's suretyship arrangement with

---

**5.** On February 7, 1991, Centex forwarded a copy of that letter to Fidelity.

**6.** For example, Fels owed Advanced Insulation $47,438.32 and Johnson controls $44,290 for labor and materials.

**7.** These funds represented $49,227 for work in place in November 1990, plus $23,920.97 for work in place in December 1990, plus $45,566.32 for work in place in January 1991, less $28,000 in retainage in connection with Fels' failure to comply with the "Buy American Act."

**8.** For a breakdown of Fidelity's payments for labor and/or materials supplied to Fels in connection with the project, see S.R. ¶¶ 41–48, 52–60.

Fels and Centex do not comply with the *D'Oench, Duhme* doctrine and its statutory requirements under section 1823(e) and, hence, Fidelity's claim is barred by the doctrine. *Id.* at 3–4.

The issue presented is one of first impression in this district; whether the *D'Oench, Duhme* doctrine, *see D'Oench, Duhme & Co. v. FDIC*, 315 U.S. 447, 460, 62 S.Ct. 676, 680–81, 86 L.Ed. 956 (1942), and 12 U.S.C. section 1823(e) may be invoked by FDIC as receiver to defeat the claims of a performing Miller Act surety under its right of equitable subrogation. For the reasons that follow, the Court finds that the doctrine in either its common law or statutory form cannot be invoked in the instant case to bar successfully Fidelity's claims against the funds in Centex's possession based on its rights as a performing surety.

### A.

The *D'Oench, Duhme* doctrine and its statutory codification under section 1823(e) cannot be invoked in this case because the Court finds that the funds in question never became the property of Fels, which did not complete its performance as a subcon-

tractor, and, hence, FDIC's security interest in Fels' accounts receivable does not include the earned but unpaid payments represented by the interpleaded funds. As a result, those funds cannot be found to be an asset "acquired by" Fels and, therefore, by the FDIC. The Court makes this finding based on suretyship law and, in particular, the doctrine of equitable subrogation.

Under equitable subrogation,[9] surety claims arising under construction projects, including those governed by the Miller Act, must be satisfied before the subcontractor and its creditors become entitled to any contract funds. *See, e.g., Pearlman v. Reliance Insurance Co.*, 371 U.S. 132, 137, 83 S.Ct. 232, 235, 9 L.Ed.2d 190 (1962) ("[A] surety who pays the debt of another is entitled to all the rights of the person he paid to enforce his right to be reimbursed."); *National Shawmut Bank v. New Amsterdam Casualty Co.*, 411 F.2d 843, 848–49 (1st Cir.1969) (Miller Act surety's right of subrogation prevailed over the bank's security interest in earned but unpaid contract funds).[10]

In the seminal Supreme Court case of *Pearlman*, a bankruptcy trustee and a surety each claimed the superior right to

---

**9.** The doctrine of equitable subrogation is founded on principles of equity, not contract. *See Pearlman v. Reliance Insurance Co.*, 371 U.S. 132, 136 n. 12, 83 S.Ct. 232, 235 n. 12, 9 L.Ed.2d 190 (1962) ("The right of subrogation is not founded on contract. It is a creature of equity; is enforced solely for the purpose of accomplishing the ends of substantial justice; and is independent of any contractual relations between the parties.") (quoting *Memphis & L.R.R. Co. v. Dow*, 120 U.S. 287, 301, 302, 7 S.Ct. 482, 489, 30 L.Ed. 595 (1887)). The First Circuit Court of Appeals, in noting that the Uniform Commercial Code does not address the doctrine, stated that "equitable subrogation is too hardy a plant to be uprooted by a Code which speaks around but not to the issue." *National Shawmut Bank v. New Amsterdam Casualty Co.*, 411 F.2d 843, 849 (1st Cir.1969). *See also Jacobs v. Northeastern Corp.*, 416 Pa. 417, 206 A.2d 49, 55 (1965) ("[S]ubrogation rights are not 'security interests' within the meaning of Article 9."); *French Lumber Co. v. Commercial Realty & Finance Co.*, 346 Mass. 716, 719, 195 N.E.2d 507 (1964) ("No provision of the Code [U.C.C.] purports to affect the fundamental equitable doctrine of subrogation.").

**10.** In *National Shawmut Bank*, a contractor applied to a surety for payment and performance

bonds. 411 F.2d at 844. Subsequent to the posting of these bonds, the contractor obtained a line of credit from a bank. As collateral for the loans, an assignment of "all monies due and which shall hereafter become due from the [owner]" was made to the bank. *Id.* The bank perfected its security interest in these monies. Thereafter, the construction contracts were terminated by the owner because of the contractor's default. The surety completed the work as required under the bonds. After the termination of the contracts, both the surety and the bank sought to satisfy their respective claims from the fund of earned but unpaid progress payments. The Court concluded that the completing surety had the superior right to these payments. *Id.* at 848–49.

In another case where the surety claimed that it was entitled to earned progress funds retained by the government owner of the construction project (but in which no bank was claiming a right to such funds), the Fifth Circuit Court of Appeals noted:

A different situation occurs when the surety completes the performance of a contract. The surety is not only a subrogee of the contractor, and therefore a creditor, but also a subrogee of the government and entitled to any rights the government has to the retained

retainage withheld by the United States out of earnings due a contractor whose contract with the United States had been terminated. *Id.* 371 U.S. at 133, 83 S.Ct. at 233. The United States, as owner, had been authorized to retain "a percentage of estimated amounts due monthly until final completion and acceptance of all work covered by the contract." *Id.* at 134, 83 S.Ct. at 233. The *Pearlman* Court held that the retainage never became the "property" of the contractor or, hence, his bankruptcy estate,[11] and concluded that the surety, not the bankruptcy trustee, was entitled to the withheld funds:

> We therefore hold in accord with the established legal principles stated above that the Government [owner] had a right to use the retained fund to pay laborers and materialmen; that the laborers and materialmen had a right to be paid out of the fund; that the contractor [subcon-

tractor], had he completed his job and paid his laborers and materialmen, would have become entitled to the fund; and that the surety, having paid the laborers and materialmen, is entitled to the benefit of all these rights to the extent necessary to reimburse it. Consequently, since the surety in this case has paid out more than the amount of the existing fund, it has a right to all of it.

*Id.* at 141–42, 83 S.Ct. at 237.[12] Thus, the doctrine of equitable subrogation, grounded in equity not contract, protects the Miller Act completing surety by ensuring that such surety has priority over other parties with respect to either unpaid progress payments or retainages of the defaulting subcontractor.[13]

### B.

Here, the Court finds that the aforementioned cases dictate the proper resolution

funds. If the contractor fails to complete the job, the government can apply the retained funds and any remaining progress money to costs of completing the job. The surety is liable under the performance bond for any damage incurred by the government in completing the job. On the other hand, the surety may undertake to complete the job itself. In so doing, it performs a benefit for the government, and has a right to the retained funds and remaining progress money to defray its costs.

*Trinity Universal Insurance Co. v. United States,* 382 F.2d 317, 320 (5th Cir.1967), *cert. denied,* 390 U.S. 906, 88 S.Ct. 820, 19 L.Ed.2d 873 (1968) (footnote omitted).

**11.** A pivotal underpinning in this conclusion was that because the retained funds were payable to the defaulting contractor only if it completed performance of its contract, they never became part of the bankrupt estate.

**12.** Although the *Pearlman* case involved retainages, rather than unpaid progress payments, courts have subsequently held that *Pearlman* applies to Miller Act progress payments. *See, e.g., In re E.R. Fegert, Inc.,* 88 B.R. 258, 261 (9th Cir. BAP1988) ("We conclude that the surety would have been entitled to assert a lien for both any unpaid progress payments or funds held as retainage."); *Balboa Insurance Co. v. United States,* 775 F.2d 1158, 1163 (D.C.1985) ("[T]here is no valid distinction between money held by the [owner] which is a 'retainage' and a 'progress payment.' In either case, the 'total fund' remaining in the [owner]'s possession, to the extent the surety has obligations arising under the contract, is available to the surety.");

*National Shawmut Bank,* 411 F.2d at 848 ("[The surety] is subrogated not only to the right of the [owner] to pay laborers and materialmen from funds retained out of progress payments, but also to the [owner]'s right to apply to the cost of completion the earned but unpaid progress payments in its hands at the time of default.") (citations omitted); *American Fire & Casualty Co. v. First National City Bank,* 411 F.2d 755, 758 (1st Cir.1969) ("[W]e hold that the surety has a superior claim to unpaid progress payments and retainage."), *cert. denied,* 396 U.S. 1007, 90 S.Ct. 563, 24 L.Ed.2d 499 (1970); *National Surety Corp. v. United States,* 319 F.Supp. 45, 49 (N.D.Ala.1970) ("It is clear from a review of the cases that the Courts make no distinction between earned progress payments and retained percentages in determining the surety's equitable rights upon the contractor's default.").

**13.** The Court could only uncover one case involving suretyship in which the FDIC was a party. *See FDIC v. Blue Rock Shopping Center, Inc.,* 766 F.2d 744 (3d Cir.1985). In *Blue Rock,* the court required "a remand for an evidentiary hearing with respect to whether the [defendants] were sureties with a right of recourse, and if they were whether they can prove that FDIC unjustifiably impaired the collateral securing the Bond." *Id.* at 751. Although the court did not conclude that the defendants were, in fact, sureties, it did note that:

> [I]n § 1823(e), Congress did not intend, nor did the Supreme Court in *D'Oench, Duhme,* to encompass agreements as remote as an agreement between a principal and a surety as to recourse.... Section 1823(e) is directed at agreements between a bank and its obligor

of the present case. Fels, a subcontractor, executed a security agreement with MNB, assigning its accounts receivable as collateral to MNB for several promissory notes.[14] Such accounts receivable would include earned but unpaid progress payments owed by Centex, the general contractor, to Fels, the subcontractor, for work *completed* on the construction project for which Fels had been hired by Centex.

With respect to that construction project, Fidelity, Centex, and Fels executed Miller Act Subcontract Performance, and Labor and Material Payment Bonds. The Performance Bond specifically stated:

> If the Surety arranges completion or remedies the default, that portion of the balance of the subcontract price as may be required to complete the subcontract or remedy the default and to reimburse the Surety for its outlays shall be paid to the Surety at the times and in the manner as said sums would have been payable to Principal had there been no default under the subcontract.

S.R., Joint Exhibit E. Because of Fels' default, Fidelity, as surety, arranged and paid for the cost of completion of the contract with another subcontractor. As a result, Fels never acquired ownership of Centex's funds because Fels did not complete its performance under the contract. Correspondingly, such funds never became a part of Fels' accounts receivable, and thus not an "asset" subject to the FDIC's security interest in Fels' accounts receivable. In the absence of an asset, then, the *D'Oench, Duhme* doctrine on the FDIC's behalf cannot be invoked. *Cf. Twin Construction, Inc. v. Boca Raton, Inc.*, 925 F.2d 378, 382 (11th Cir.1991); *Bateman v. FDIC*, 766 F.Supp. 1194, 1201 (D.Me.1991). Accordingly, the Court finds that the right to ownership of the interpleaded funds in the amount of $90,713.32 is in Fidelity, not the FDIC.[15]

## III.

■ In an interpleader action, the Court of Appeals for the First Circuit has stated

*Id.* at 858.

14. Here, MNB perfected its security interest before the suretyship agreement between Fels and Fidelity had been executed. Although this fact distinguishes the instant case from aforementioned cases, the Court does not find this distinction to be dispositive because the doctrine of subrogation controls. *See American Fire & Casualty Co.*, 411 F.2d at 757–58. In *American Fire & Casualty Co.*, the court rejected the surety's contention that its assignment from the subcontractor had priority over that of the bank but it agreed with the surety's second major contention that "irrespective of any question of assignment, it is to be preferred to the Bank on ordinary theories of legal subrogation." *Id.* at 758.

15. The Court is well aware of the strong policy favoring the invocation of the *D'Oench, Duhme* doctrine to ensure the FDIC's ability to make a speedy and accurate assessment of a failed bank's records in order to evaluate the worth of its assets and to avoid an interruption in banking services. *See Langley v. FDIC*, 484 U.S. 86, 91, 108 S.Ct. 396, 400–01, 98 L.Ed.2d 340 (1987). The Court has liberally applied the doctrine to effect this policy. *See, e.g., Fleet Bank of Maine v. Wilson*, 780 F.Supp. 841 (D.Me.1991); *New Maine National Bank v. Benner*, 774 F.Supp. 36 (D.Me.1991); *Bateman v. FDIC*, 766 F.Supp. 1194 (D.Me.1991); *New Maine National Bank v. Seydler*, 765 F.Supp. 770 (D.Me.1991).

showing or attempting to show that the obligation was illusory or conditional. We do not believe that Congress intended, even by language which speaks of 'diminishing or defeating' the title of FDIC, to extend § 1823(e) to cover agreements between the [defendants] and the corporation relative to the [defendants'] status.

*Id.* at 754.

Although this case was decided prior to *Langley*, which broadened the scope of the term "agreements" under section 1823(e), a survey of the case law reveals that *Blue Rock* provides the only judicial statement on the application of the *D'Oench, Duhme* doctrine to suretyship agreements involving the Miller Act. A later Court of Appeals for the Third Circuit case, *Adams v. Madison Realty & Development, Inc.*, 937 F.2d 845 (3d Cir.1991), which did not involve a Miller Act surety bond, criticized the *Blue Rock* holding:

*Langley [v. F.D.I.C.*, 484 U.S. 86, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987) makes it clear that the "agreement" covered by section 1823(e) and the *D'Oench, Duhme* doctrine extends to any warranty on which a party's performance is conditioned. There is absolutely no indication that the Court's reasoning should be limited to obligations between a bank and its obligor. To the extent then that *Blue Rock*, a case decided before *Langley*, is inconsistent with the Supreme Court's opinion in *Langley*, our statement in *Blue Rock* must yield.

the standard for determining who pays for the award of fees and costs as follows: "An interpleader fee is usually awarded out of the fund to compensate a totally disinterested stakeholder who has been, by reason of the possession of the fund, subjected to conflicting claims through no fault of its own." *Ferber Co. v. Ondrick,* 310 F.2d 462, 467 (1st Cir.1962), *cert. denied,* 373 U.S. 911, 83 S.Ct. 1300, 10 L.Ed.2d 412 (1963) (footnote omitted). *See also* 7 C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 1719, at 629–30, 632–33 (2d ed. 1986).

The Court concludes that Centex is a disinterested stakeholder and, that it "brought this action based on its good faith belief that there was a threat of possible multiple litigation ... [and that it] sought and did not receive clear direction from fidelity [sic] as to what to do with the $90,713.32 progress payment." *See* Motion for Judgment on Stipulated Facts at 2. No evidence exists in the record that Centex's conduct warrants taxing costs and attorneys' fees directly against it. Therefore, the Court concludes that the award of costs and attorneys' fees should be paid to Centex directly out of the interpleaded funds.

### IV.

Accordingly, it is hereby ORDERED that the interpleaded funds in the amount of Ninety Thousand Seven Hundred Thirteen Dollars and Thirty–Two Cents ($90,713.32), plus interest and costs, be awarded to Fidelity & Deposit Company of Maryland, less the amount of reasonable attorneys' fees and costs.[16]

Counsel shall confer forthwith and make a good faith attempt to agree upon reasonable attorneys' fees and costs and shall file, on or before June 8, 1992, written submissions on the issues generated in respect to assessment of reasonable attorneys' fees or an agreed-upon resolution of such issues. In the absence of agreement, the

Court will resolve any such issues upon the written submissions.

---

**16.** Counsel represented to the Court at conference on April 30, 1992 that they had settled the claim generated by Fidelity's withholding of

$90,713.32, the precise amount of funds in controversy herein ultimately paid into the Court as the *res* of this interpleader action.