RESOLUTION TRUST CORPORATION, in its Capacity as Conservator for Midwest Savings Association, a Federal Association, Plaintiff,

v.

FORD MALL ASSOCIATES LIMITED PARTNERSHIP; a Minnesota limited partnership; Haskell's Inc., a Minnesota corporation; Milton Cohen; Joseph Weis; Specialty Sales Service, Inc.; Julius B. Nelson & Son, Inc.; St. Paul Linoleum & Carpet Co., Inc.; Minnesota Mechanical, Inc.; Seal–Treat, Inc.; Wheeler Hardware Company; Jesco, Inc.; J.P. Albert Co., Inc.; Nichols & Hines, Inc.; Ron's Cabinets, Inc.; Gateway Glass Co.; Pope Associates, Inc.; Yale Incorporated; Stewart Lumber Company; Specialty Systems, Inc.; Grazzini Brothers & Company; Industrial Sprinkler Corporation; Curran V. Nielsen Company, Inc.; Minnesota Fence & Iron Works, Inc.; Weber Electric, Inc.; Weis Builders, Inc.; Wilfred S. Gall d/b/a Willie's Dumpster Service; Minuti–Ogle Co., Inc.; Spancrete Midwest Company; Western Steel Erection, Inc.; Glenn Rehbein Excavating, Inc., Defendants,

and

Weis Builders, Inc., Intervener.

WEIS BUILDERS, INC., Plaintiff,

v.

FORD MALL ASSOCIATES LIMITED PARTNERSHIP; Milton J. Cohen; Joseph C. Weis; Resolution Trust Corporation, in its capacity as Conservator for Midwest Savings Association, a Federal Association; Minuti–Ogle Co., Inc.; Jesco, Inc.; Yale, Inc.; Gateway Glass Co.; Weber Electric, Inc.; Industrial Sprinkler Corporation; Pope Associates, Inc.; St. Paul Linoleum & Carpet Co., Inc.; Seal–Treat, Inc.; Wheeler Hardware Company; Ron's Cabinets, Inc.; Stewart Lumber Company; Nichols & Hines, Inc.; Grazzini Brothers & Company; Specialty Systems, Inc.; Julius B. Nelson & Son, Inc.; Norwest Bank Minneapolis, National Association; The Roseville Bank; and Haskell's Inc., Defendants,

and

Spancrete Midwest Company, Intervener,

v.

RESOLUTION TRUST CORPORATION, in its Capacity as Conservator for Midwest Savings Association, a Federal Association, Defendant and Third Party Plaintiff,

v.

LAWYERS TITLES INSURANCE CORPORATION and Metro Title Corporation, Third–Party Defendants.

Civ. No. 4–89–971.

United States District Court,
D. Minnesota,
Fourth Division.

Jan. 30, 1992.

Mary Elizabeth Senkus, Patrick J. McLaughlin, Linda J. Soranno, Oppenheimer Wolff & Donnelly, Madge S. Thorsen, and Popham, Haik, Schnobrich & Kaufman, Ltd., Minneapolis, Minn., for Resolution Trust Corporation.

Milton Cohen, pro se.

Paul L. Ratelle, and Fabyanske, Svoboda, Westra, Davis & Hart, P.A., Minneapolis, Minn., for Lawyers Titles Ins. Corp. and Metro Title Corp.

Al Edwall, and Robins, Kaplan, Miller & Ciresi, Minneapolis, Minn., for Ford Mall Associates Limited Partnership and Joseph C. Weis.

Jeffrey A. Hanson, Paul William Bucher, Ken D. Schueler, and Dunlap, Finseth, Berndt & Sandberg, Rochester, Minn., for Weis Builders, Inc.

James K. Sander, and Wagner, Johnston & Falconer, Minneapolis, Minn., for Mechanics' Lien Coordinator.

William D. Hull, and Timmer & Van Vliet, Minneapolis, Minn., for Jesco, Inc.

Alan K. Ruvelson, Jr., and Ruvelson, Kautzer & Schmidt, Ltd., St. Paul, Minn., for Wheeler Hardware Co.

Jack D. Elmquist, Thomas F. Surprenant, and Jack D. Elmquist Law Offices, Minneapolis, Minn., for Minuti–Ogle Co.

Peter C. Halls, and Faegre & Benson, Minneapolis, Minn., for Julius B. Nelson & Son, Inc.

Joseph F. Grabowski, Grabowski Law Office, Plymouth, Minn., for Specialty Sales Service, Inc.

Philip T. Colton, Maun & Simon, Minneapolis, Minn., for St. Paul Linoleum & Carpet Co., Inc.

Michael D. Quayle, Green, Merrigan, Johnson & Quayle, Minneapolis, Minn., for Minnesota Mechanical, Inc.

Thomas J. Williams, Miller & Williams, Minneapolis, Minn., for Seal–Treat, Inc.

J.P. Albert Co., Inc., pro se.

Jack Mertes, Edina, Minn., for J.P. Albert Co. Inc.

John M. Koneck, Ronda P. Bayer, Fredrikson & Byron, Minneapolis, Minn., for Nichols & Hines, Inc.

David Joseph Meyers, Rinke & Noonan, St. Cloud, Minn., for Ron's Cabinets, Inc.

Michael John Minenko, Michael D Madigan, Johnson & Madigan, Minneapolis, Minn., for Gateway Glass Co.

James Eric Lindell, Minneapolis, Minn., for Pope Associates, Inc.

James Kenneth Sander, Wagner, Johnston & Falconer, Minneapolis, Minn., for Yale, Inc.

John Gilbert Gisselquist, Gisselquist Law Office, St. Paul, Minn., for Stewart Lumber Co.

Harold Julian Slawik, III, Slawik Law Office, St. Paul, Minn., Melissa A. Miller, Roseville, Minn., for Grazzini Bros. & Co.

John Gerard Patterson, Timothy Charles Cook, Moore, Costello & Hart, St. Paul, Minn., for Industrial Sprinkler.

Peter W. Johnson, Johnson & Wood, Wayzata, Minn., for Curran V. Nielsen Co.

Andrew J. Eisenzimmer, John C. Gunderson, Meier, Kennedy & Quinn, St. Paul, Minn., for Minnesota Fence & Iron Works, Inc.

Todd Stedtfeld, Stedtfeld Law Office, River Falls, Wis., Bruce Lennart Beck, Galena & Beck, St. Paul, Minn., for Weber Elec., Inc.

Allen E. Christy, Jr., Hadlick, Hoedeman & Christy, Minneapolis, Minn., for Wilfred S. Gall.

James Todd Swenson, MacKall, Crounse & Moore, Minneapolis, Minn., David Paul Newman, Herrick & Newman, Coon Rapids, Minn., for Spancrete Midwest Co.

Robert P. Laue, Snelling, Christensen & Briant, Minneapolis, Minn., for Western Steel Erection, Inc.

Jeffrey L. Knutson, Glenn Rehbein Excavating, Inc., Lino Lakes, Minn., for Glenn Rehbein Excavating, Inc.

Gary Alan Heck, Faegre & Benson, Minneapolis, Minn., for Norwest Bank Minneapolis.

Paul D. Dove, Arnold & McDowell, Minneapolis, Minn., for Roseville Bank.

Paul Laurin Ratelle, Fabyanske, Svoboda, Westra & Davis, Gerald G. Workinger, Jr., Workinger Law Office, Minneapolis, Minn., for Lawyers Title Ins. Corp.

## ORDER

DOTY, District Judge.

## BACKGROUND

This case involves various disputes arising out of the renovation and new construction of the Ford Mall project ("project").[1] On December 29, 1986, Ford Mall Association Limited Partnership ("FMALP"), the project's developer, executed a mortgage to MWF Mortgage Corporation ("MWF"), a wholly owned subsidiary of Midwest Federal Savings and Loan Association ("Midwest Federal"). MWF obtained a title insurance policy from Metro Title Corporation ("Metro"), an agent for third-party defendant Lawyers Titles Insurance Corporation ("LTIC"), allegedly insuring the mortgage against mechanics' liens and entrusting the mortgage to Metro for recording. Metro, however, failed to record the mortgage until July of 1987.[2] On March 10, 1989, MWF commenced the present lawsuit to foreclose its mortgage on the project.

Weis Builders was general contractor on the project. It commenced a lawsuit on April 27, 1989, contending that the mechanics' liens of Weis Builders and its subcontractors have priority under Minnesota law because the first visible signs of improvement to project occurred in late 1986, prior to the execution of MWF's mortgage.[3] If those improvements are deemed insuffi-

---

1. The facts underlying the present case are more fully set forth in the court's order dated March 27, 1991.

2. Metro recorded MWF's mortgage with the County Recorder on July 6, 1987 and with the Registrar of Titles on July 22, 1987.

3. The Minnesota mechanics' lien statute provides that:

All liens, as against the owner of the land, shall attach and take effect from the time the first item of material or labor is furnished upon the premises for the beginning of the improvement, and shall be preferred to any mortgage or other encumbrance not then of record, unless the lienholder had actual notice thereof.

Minn.Stat. § 514.05, subd. 1.

cient to establish the priority of their liens, the mechanics' lien claimants nonetheless contend that their work from January until June 1987 established their priority because it occurred prior to the recording of MWF's mortgage.

Midwest Federal was declared insolvent and placed under the conservatorship of Federal Savings Loan Insurance Corporation ("FSLIC") on February 13, 1989. *See Northwest Racquet Swim & Health Clubs v. Resolution Trust Corp.*, 927 F.2d 355, 357–58 (8th Cir.1991) (declaring Midwest Federal insolvent because its obligations to creditors exceeded its assets). In May 1989, the Federal Home Loan Bank Board ("FHLBB") authorized FSLIC to transfer substantially all of Midwest Federal's assets and liabilities to a new federal association, Midwest Savings Association ("MSA"). Among the assets transferred were those of MWF Mortgage Corporation. On July 13, 1989, MSA, as sole shareholder of MWF Mortgage Corporation, approved a plan of complete liquidation and voluntary dissolution of MWF Mortgage Corporation. On August 9, 1989, the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA") abolished FSLIC and replaced it with Resolution Trust Corporation ("RTC") for purposes of winding up thrifts, conservatorships and receiverships. RTC thus replaced FSLIC as the conservator of MSA. On October 5, 1990, RTC became sole receiver for MSA. FMALP's mortgage is an asset of MSA and RTC asserts MSA's claims in its capacity as receiver.

In an order dated March 27, 1991, the court determined that material fact disputes exist concerning the priority of the mechanics' lien claims and also several issues involving the title insurance policy and thus denied various motions for summary judgment. The parties' request rulings on various other issues concerning the priority of their interests under federal and state law. The court will address each issue in turn.

**4.** As the Eighth Circuit noted:
  Section 1823(e), as amended by FIRREA, essential codifies the *D'Oench* doctrine and both are generally construed in tandem. Both,

### 1. *Priority Issues Under Federal Law*

#### A. The *D'Oench, Duhme* Doctrine

■ LTIC argues that the *D'Oench, Duhme* doctrine estops the mechanics' lien claimants from asserting the priority of their liens. In *D'Oench, Duhme & Co. v. Federal Deposit Insurance Corp.*, the Supreme Court established a common law estoppel doctrine that prohibits the use of "secret agreements" to defend against efforts by the Federal Deposit Insurance Corporation ("FDIC") to collect on notes that it acquires from failed banks. 315 U.S. 447, 460, 62 S.Ct. 676, 680, 86 L.Ed. 956 (1942). The doctrine is designed to protect the FDIC from "misrepresentations and secret agreements which might result in it incorrectly assessing the value of bank holdings for institutions which it is insures, makes loans, or acquires in its corporate capacity." *Federal Deposit Ins. Corp. v. P.L.M. Int'l, Inc.*, 834 F.2d 248, 252 (1st Cir.1987). The statutory counterpart of the doctrine provides that:

> No agreement which tends to diminish or defeat the interest of the [FDIC] in any asset acquired by it under this section ... shall be valid against the corporation unless such agreement—
>
> (1) is in writing,
>
> (2) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,
>
> (3) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and
>
> (4) has been, continuously, from the time of its execution, an official record of the depository institution.

12 U.S.C. § 1823(e) (section applicable to the FDIC).[4] Courts have also extended the

however, remain separate and independent grounds for decision.
  *Reding v. Federal Deposit Ins. Corp.*, 942 F.2d 1254, 1259 (8th Cir.1991) (citations omitted).

doctrine to protect both FSLIC, *see, e.g., FirstSouth F.A. v. Aqua Constr., Inc.*, 858 F.2d 441, 442 (8th Cir.1988), and RTC. *See, e.g., Adams v. Madison Realty & Dev.*, 937 F.2d 845, 852 (3d Cir.1991).

LTIC argues that the doctrine extends to the present priority dispute, relying on a decision of the United States District Court for the District of Maine, *Bateman v. Federal Deposit Insurance Corp.*, 766 F.Supp. 1194 (D.Me.1991). *Bateman* involved a similar priority dispute between a mechanics' lien and a mortgage acquired by a bridge bank.[5] *Id.* at 1201. The mechanics' lien claimant argued that its lien was entitled to priority under Maine law and that the *D'Oench, Duhme* doctrine did not apply to mechanics' liens asserted by a nonborrower. *Id.* The court determined that under Maine law a valid mechanics' lien was predicated on the existence of an express or implied contract between a property owner and lienor. *Id.* at 1201. The court found that such a contract was an "agreement" that tended to diminish or defeat the bridge bank's mortgage interest, and thus had to satisfy the requirements of both the statutory and common law *D'Oench, Duhme* doctrine.[6] *Id.* at 1199–1200. The court noted that the mechanics' lienor:

> The court will construe both the common law and statutory doctrine in tandem because there is no difference between the two versions for purposes of the present issue.

**5.** Pursuant to 12 U.S.C. § 1821(n), the FDIC is authorized to establish bridge banks to facilitate in the reorganization of failed banks.

**6.** The *Bateman* court applied the statutory version of the *D'Oench, Duhme* doctrine applicable to bridge banks, 12 U.S.C. § 1821(n)(4)(I), which is virtually identical to the statutory version applicable to the FDIC, 12 U.S.C. § 1823(e). In construing § 1821(n)(4)(I), the *Bateman* court relied on the United States Supreme Court's broad construction of the term "agreement" pursuant to § 1823(e). *Langley v. Federal Deposit Ins. Corp.*, 484 U.S. 86, 92–93, 108 S.Ct. 396, 401–402, 98 L.Ed.2d 340 (1987) (an agreement is "a scheme or arrangement that is likely to mislead banking authorities"). Although *Langley* interpreted § 1823(e), the *Bateman* court noted that the language of the two sections is virtually identical and that both sections are codifications and clarifications of the common law *D'Oench, Duhme* doctrine. *Id.* at 1199. The court thus determined that the *Langley* deci-

offers no evidence of a writing executed by [the bank] addressing the construction agreement between [the property owner] and [the mechanics' lienor]. In the absence of such an executed writing, the agreement underlying the mechanics' lien cannot meet the requirements of § 1821(n)(4)(I).

*Id.* at 1201. In the absence of a writing executed by the defunct, predecessor bank, the court determined that the common law and statutory *D'Oench, Duhme* doctrine estopped the mechanics' lienor from asserting its lien as either a defense or an affirmative claim against the bridge bank's mortgage interest. *Id.*

LTIC urges the court to follow *Bateman* in the present case.[7] It argues that the mechanics' liens at issue are also "agreements" for purposes of the doctrine because they arise from either an express or implied contract between the lienors and Weis Builders and that the enforcement of the liens would tend to diminish or defeat MWF's mortgage interest in the Ford Mall project.[8] It further contends that neither MWF nor MSA, its successor in interest, executed any written agreement to pay the liens and thus the mechanics' lienors are

sion applies with equal force to § 1821(n)(4)(I). *Id.* at 1200 & n. 6.

**7.** LTIC does not contend that the mechanics' lienors entered into a secret agreement with either MWF or its successors in interest, nor does LTIC argue that the bank's records mischaracterized the mechanics' liens. RTC also does not seek to collect any obligation from the mechanics' lienors.

**8.** LTIC also argues that the court has previously acknowledged that the *D'Oench, Duhme* doctrine applies to the present case. In its order dated March 27, 1991, the court applied the doctrine to estop one of the borrowers from asserting a defense that his obligations under the loan documents were contingent upon MWF's oral promise to either increase or continue funding the construction loan. *Resolution Trust Corp. v. Ford Mall Assoc. Ltd. Partnership*, No. 4–89–971, slip op. at 42–43 (D.Minn. March 27, 1991). The borrower's defense, however, fits squarely within the four corners of the *D'Oench, Duhme* doctrine and thus is distinguishable from the defense asserted by the mechanics' lien claimants.

estopped from asserting their priority.[9]

The court, however, declines to follow *Bateman.* The court first notes that the mechanics' lienor in *Bateman* apparently raised only one defense to the *D'Oench, Duhme* doctrine: that the doctrine did not apply to its mechanics' lien because the contractor was not a "borrower" of the failed bank.[10] *Id.* at 1201. Other courts have also rejected that defense, reasoning that the doctrine is not limited to agreements between the bank and its borrowers.[11] *See, e.g., Adams,* 937 F.2d at 857–58 ("[t]he word 'agreement' in section 1823(e) is not limited to express agreements between a bank and a borrower"); *First State Bank v. City & County Bank,* 872 F.2d 707, 717 (6th Cir.1989) (doctrine extends to preclude defense evidenced by oral agreements between failed bank and a second bank). Whether a party is a borrower or non-borrower, cases applying the doctrine typically involve a federal insurer's action to collect on a written debt instrument, with the borrower or a guarantor raising various defenses based on the alleged existence of a conflicting unwritten agreement with the failed bank itself.[12] *See, e.g., Federal Deposit Ins. Corp. v. Kasal,* 913 F.2d 487, 491 (8th Cir.1990)

(statute precludes borrowers from asserting unwritten side agreements with bank president to support their defense that they had already paid notes at issue), *cert. denied,* —— U.S. ——, 111 S.Ct. 1072, 112 L.Ed.2d 1178 (1991); *Federal Deposit Ins. Corp. v. Krause,* 904 F.2d 463, 466 (8th Cir.1990) (borrowers may not assert a settlement agreement signed by bank president but not reflected in minutes of board of directors or loan committee as a defense); *FirstSouth,* 858 F.2d at 443–44 (doctrine estopped accommodation guarantor of promissory note from asserting a contradictory oral side agreement between guarantor and bank). Although some courts hold that the doctrine encompasses unwritten agreements to which the failed bank was never a party, those unwritten agreements still involve a party's duty to perform some obligation, generally its obligation to repay, in connection with the bank's asset. *See, e.g., Chatham Ventures, Inc. v. Federal Deposit Ins. Corp.,* 651 F.2d 355, 359–61 (5th Cir.1981) (pursuant to section 1823(e), borrower may not avoid its obligation to repay note by arguing that it entered into an agreement with a third party rather than the failed bank).[13]

**9.** The court notes that if LTIC's argument is carried to its logical conclusion, LTIC may be estopped from arguing that its failure to properly record the mortgage was not a proximate cause of any loss of priority because that defense may also be encompassed by the *D'Oench, Duhme* doctrine. The court further notes that RTC has not taken a position as extreme as that asserted by LTIC.

**10.** That is the only defense to the doctrine actually set forth in the *Bateman* opinion.

**11.** The court notes that a contractor or subcontractor, even as a non-borrower, may come under the control of the *D'Oench, Duhme* doctrine if it claims to have a secret, unwritten agreement that directly defeats some interest of the bank. For example, the Eleventh Circuit applied the doctrine to estop a contractor who was a non-borrower from asserting oral side agreements that conflicted with its written agreement with the bank. *Twin Constr. v. Boca Raton, Inc.,* 925 F.2d 378, 380 (11th Cir.1991). In *Twin Construction,* a contractor entered into a written agreement with a failed bank to subordinate its mechanics' lien to the bank's mortgage. The contractor claimed that in return for subordinating its rights, the bank promised in an un-

written side agreement to reserve sufficient funds to cover the contractor's work and to issue joint checks to the contractor and the borrower. *Id.* When the bank fulfilled neither condition the contractor attempted to overturn its written subordination agreement. The Eleventh Circuit applied *D'Oench, Duhme* to thwart the contractor's defense. *Id.* at 381–83. Following this line of cases, the court concurs with *Bateman* to the extent that it stands for the proposition that parties may not escape the *D'Oench, Duhme* doctrine merely because they are not borrowers of the failed bank.

**12.** Other common factual settings involve claims that the failed bank has defrauded the borrower in some fashion or made oral inducements. *Milligan v. Gilmore Meyer Inc.,* 775 F.Supp. 400, 404 (S.D.Ga.1991). No such claims are made in the present case.

**13.** The court thus rejects the mechanics' lienors' contention that the *Bateman* court was the first court to extend the doctrine to agreements in which the bank was never a party. *Bateman,* however, is apparently the first court to find that ordinary mechanics' liens constitute agreements for purposes of the doctrine.

In *Langley v. Federal Deposit Insurance Corp.*, the Supreme Court broadly construed the term "agreement" in section 1823(e) to include not only express promises to perform future acts, but also any unwritten promise that operates as a condition precedent to a party's obligation to repay. 484 U.S. 86, 92–93, 108 S.Ct. 396, 401–02, 98 L.Ed.2d 340 (1987). Thus, an " 'agreement' includes any warranty on which the performance of a party is conditioned." *Adams*, 937 F.2d at 857 (construing *Langley*).

In its analysis of the *D'Oench, Duhme* doctrine, the *Bateman* court relies on *Langley's* interpretation of "agreement," finding that a mechanics' lien "is well within the *Langley* Court's definition of ... 'agreements.' " 766 F.Supp. at 1201. When the *Langley* Court expanded the scope of the term "agreement", however, its analysis affirmed that *D'Oench, Duhme* focuses primarily on alleged side agreements with a bank:

> A second purpose of § 1823(e) is implicit in its requirement that the "agreement" not merely be on file in the bank's records at the time of an examination, but also have been executed and become a bank record "contemporaneously" with the making of the note and have been approved by officially recorded action of the bank's board or loan committee. These later requirements ensure mature consideration of unusual loan transactions by senior bank officials, and prevent fraudulent insertion of new terms, with the collusion of bank employees, when a bank appears headed for failure.

*Id.* at 92, 108 S.Ct. at 401. Thus, the Court was concerned about bank agreements or loan transactions that might eventually bind the FDIC, holding that such agreements must be monitored and approved by senior bank officials. The *Langley* Court did not suggest that *D'Oench, Duhme* was designed to invalidate interests that exist wholly independently of a party's obligation to repay the bank on a note or other asset. The *Bateman* court, however, expands *Langley's* definition to encompass an interest to which the bank was never a party and that does not involve any condition precedent to an obligation to repay, any promise of future performance, or any other warranty on which performance to or by the bank is conditioned. The mechanics' liens in the present action owe no past or future performance to nor do they seek any performance from either the failed bank or RTC. The court therefore finds that *Bateman's* reliance on *Langley* is misplaced.

The court also rejects *Bateman's* conclusion that mechanics' liens are merely creatures of "agreement". The existence of an unwritten agreement is essential to the application of *D'Oench, Duhme.* As the Fifth Circuit noted:

> if a claim is based on an agreement, that agreement must meet the requirements of section 1823(e). But neither section 1823(e) nor the *D'Oench, Duhme* doctrine prevents plaintiffs from asserting affirmative claims or defenses that do not depend on agreements.

*Garrett v. Commonwealth Mortgage Corp.*, 938 F.2d 591, 595 (5th Cir.1991) (citing *Langley*, 484 U.S. at 93–94, 108 S.Ct. at 402–03). The Fifth Circuit thus refused to apply the doctrine to dismiss plaintiff's claims for breach of fiduciary duty and negligence because neither claim "necessarily depends on an agreement between the parties." *Id.* at 594. The *Bateman* court found the requisite agreement by looking to an alleged "construction contract" between the mechanics' lienor and the property owner, and concluded that it must be evidenced by some writing by the bank.[14] Mechanics' liens, however, do not arise solely from construction contracts but also depend on the operation of state law. *Cf. Patterson v. Federal Deposit Ins. Corp.*, 918 F.2d 540, 543–44 (5th Cir.1990) (§ 1823(e) does not bar defenses, such as a homestead exemption, based on well-established state law); *Kile v. Federal Deposit Ins. Corp.*, 641 F.Supp. 723, 726 (E.D.Tenn. 1986) (holding that § 1823(e) does not apply

---

14. The *Bateman* decision does not reveal the details of that alleged "construction contract,"

for example, whether the mechanics' lienor was a general contractor or a subcontractor.

when the FDIC's security interest is subordinate to another lien by operation of state law rather than as a result of an oral side agreement with the failed bank). The priority of such liens is also governed by operation of state law rather than the terms of any construction agreement.[15] By holding that the mechanics' liens are agreements within *D'Oench, Duhme*, the court would effectively eliminate the agreement requirement because some sort of "agreement" could be found regarding virtually every asset of a failed bank. *Cf. Agri Export Coop. v. Universal Sav. Ass'n*, 767 F.Supp. 824, 833–34 (S.D.Tex.1991) (holding that doctrine does not require that all obligations to RTC or claims and defenses against RTC must comply with § 1823(e)). The court thus declines to construe the term "agreement" as broadly as the *Bateman* court.

In a mortgage foreclosure, the District Court for the Northern District of New York was faced with a priority dispute between a mortgage, asserted by the FDIC as receiver for a construction lender bank, and various mechanics' liens. *Yankee Bank for Finance & Sav. v. Task Assoc.*, 731 F.Supp. 64, 67–68 (N.D.N.Y.1990); *cf. Federal Deposit Ins. Corp. v. Key Biscayne Dev. Ass'n*, 858 F.2d 670, 674 (11th Cir.1988) (based on parties' agreement, applying Florida state law to evaluate the priority of the FDIC's mortgage liens over mechanics' liens). The mechanics' lienors argued that the failed bank lost its priority when it allegedly violated New York State lien law by advancing funds to the property

owner without first securing a surety payment bond from real estate developers for the protection of subcontractors. *Id.* at 67–68. The court applied state mechanics' lien law rather than federal common law [16] and explicitly rejected the FDIC's claim that *D'Oench, Duhme* precluded the mechanics' lienors' defense, reasoning that:

> The FDIC is not so financially fragile that persons with viable state law claims should be deprived of the ability to fully assert ... statutory rights against a bank....

*Id.* at 69; *cf. Bascom Constr. v. Federal Deposit Ins. Corp.*, 777 F.Supp. 123, 125 (D.N.H.1991) (holding that mechanics' lienors' defense, arising under state law and concerning the adequacy of the FDIC's bidding in foreclosure sale, was not an "agreement" for purposes of the doctrine), *rev'd on other grounds*, 779 F.Supp. 206 (D.N.H. 1991). The Eighth Circuit also acknowledged the rising criticism of the *D'Oench, Duhme* doctrine but nonetheless felt "constrained" to apply the doctrine when the borrowers' defense fit squarely within its four corners. *See Kasal*, 913 F.2d at 492. In the present case, the court finds that ordinary mechanics' liens do not present the type of secret arrangement that *D'Oench, Duhme* was designed to preclude [17] and thus refuses to hold that the doctrine extinguishes such claims simply because some unwritten agreement allegedly lurks in the background. The court therefore concludes that the mechanics'

---

**15.** Absent contrary federal law, the validity and priority of the present liens would be governed by Chapter 514 of the Minnesota Statutes. Other courts have also bound the FDIC by priorities established under state law. *See, e.g., Patterson*, 918 F.2d at 543–44; *Yankee Bank*, 731 F.Supp. at 67 (applying state lien law rather than doctrine or federal common law to priority dispute between mechanics' lienors and FDIC); *Kile*, 641 F.Supp. at 729–30 (applying state law to evaluate priority dispute regarding deeds of trust).

**16.** The court refused to apply the federal common law rule of "first in time, first in right" rather than state mechanics' lien law. 731 F.Supp. at 67; *cf. Chicago Title Ins. Co. v. Sherred Village Assoc.*, 708 F.2d 804, 808–09 (1st

Cir.1983) (rejecting application of federal "first in time rule" and applying state law to evaluate priority dispute between mechanics' liens and a mortgage insured by and assigned to the Department of Housing and Urban Development). Although that choice of law issue was not raised in the present case, the court notes that the mechanics' lien claimants may have priority under that rule.

**17.** *D'Oench, Duhme* characterizes such secret agreements as those in which a borrower "len[ds] himself to a scheme or arrangement whereby the banking authority ... [i]s likely to be misled." 315 U.S. at 460, 62 S.Ct. at 681. LTIC never specifies how RTC was likely misled by the claims of the mechanics' lienors.

lienors are not estopped from asserting the priority of their claims.[18]

### B. The Federal Insolvency Statute

■ LTIC also contends that RTC's mortgage interest is entitled to absolute priority under the federal insolvency statute, 31 U.S.C. § 3713(a).[19] LTIC argues that the statute applies because "the claims against FMALP are, in effect, claims of the federal government." The Supreme Court has held, however, that debts do not become debts of the federal government merely because they are owed to an agency of the United States:

It does not follow that because the [National Labor Relations] Board is an agency of the United States, any debt owed it is a debt owing to the United States within the meaning of [the federal insolvency statute]. The priority granted by that statute was designed 'to secure an adequate public revenue to sustain the public burthens and discharge the public debts.' There is no function here of assuring the public revenue. The beneficiaries of the claims are private persons....

*Nathanson v. National Labor Relations Bd.*, 344 U.S. 25, 27–28, 73 S.Ct. 80, 82–83, 97 L.Ed. 23 (1952) (citations omitted) (construing predecessor of present statute). An agency must be deemed an integral part of the governmental mechanism to invoke the statute's protection. *Cf. United States Dept. of Agriculture v. Remund,*

330 U.S. 539, 541–42, 67 S.Ct. 891, 892–93, 91 L.Ed. 1082 (1947) (determining that Farm Credit Administration is entitled to priority under predecessor of present statute because it administers and lends funds from the United States Treasury and returns repaid funds to Treasury, and thus is "an integral part of the governmental mechanism"); *Small Business Admin. v. McClellan,* 364 U.S. 446, 449–50, 81 S.Ct. 191, 194–95, 5 L.Ed.2d 200 (1960) (Small Business Administration, which receives all of its funds from United States Treasury, is entitled to statutory priority as integral part of federal government).

In similar circumstances, the United States District Court for the Southern District of New York held that claims asserted by the FDIC are not entitled to absolute priority under the federal insolvency statute because:

the FDIC is not an integral part of the governmental mechanism but is rather a separate legal entity serving essentially a proprietary rather than a sovereign function.

*Lapadula & Villani, Inc. v. United States,* 563 F.Supp. 782, 784 (S.D.N.Y. 1983). The *Lapadula* court reasoned that:

The FDIC's profits do not inure to the benefit of the United States and its losses are not borne by the United States. Thus, the public treasury will be unaffected by the FDIC's success or failure in recovering the debts owed to it as

---

**18.** The mechanics' lienors also raise three other defenses to the *D'Oench, Duhme* doctrine. They first contend that the doctrine does not apply because their liens do not "diminish or defeat" the RTC's interest in MWF's mortgage. They argue that the mortgage may have been junior at the time that it was executed and also that LTIC's alleged failure to timely record the mortgage may be the action that diminishes or defeats RTC's interest. The lienors also note that if their liens are prior to the mortgage, RTC will probably be entitled to the proceeds from LTIC's title insurance policy and that this situation may produce more money for RTC than the sale of the property itself.

The mechanics' lienors further assert that if the *D'Oench, Duhme* doctrine does apply to their claims, that their liens satisfy the requirements of section 1823(e).

The mechanics' lien claimants also argue that extending *D'Oench, Duhme* to destroy the priori-

ty of their liens may violate their rights under Article V of the United States Constitution.

The court does not reach these issues based on its determination that *D'Oench, Duhme* doctrine does not apply for the reasons set forth in this opinion.

**19.** The statute provides that:

A claim of the United States Government shall be paid first when—
(A) a person indebted to the Government is insolvent and—
(i) the debtor without enough property to pay all debts makes a voluntary assignment of property;
(ii) property of the debtor, if absent, is attached; or
(iii) an act of bankruptcy is committed....
31 U.S.C. § 3713(a)(1).

successor in interest to the claims of the [failed bank].

*Id.* Relying on *Lapadula*, the United States District Court for the District of Maryland examined the same criteria to determine if FSLIC, the predecessor to RTC, was an integral part of the federal government. *Federal Sav. & Loan Ins. Corp. v. Williams*, 599 F.Supp. 1184, 1203–04 (D.Md.1984) (evaluating whether the United States was an appropriate party in a lawsuit because FSLIC had commenced the action). The court finds that the same analysis should be used to determine if RTC is entitled to priority under the federal insolvency statute. *Cf. In re Resolution Trust Corp.*, 888 F.2d 57, 59 (8th Cir.1989) (determining that RTC stands in the shoes of FSLIC); 12 U.S.C. § 1441a(b)(6).

■ LTIC, however, argues that *Lapadula* and *Williams* are inapposite because recent failures in the savings and loan industry directly affect the public treasury and RTC is itself on the verge of insolvency. The court rejects that contention. RTC is an agency of the United States and its actions are independent of the United States. *See* 12 U.S.C. § 1441a(b)(1)(B). Its source of funds is not the federal government but the Resolution Funding Corporation ("RFC"), 12 U.S.C. § 1441b(a), which in turn derives its funds from insured associations. 12 U.S.C. § 1441b(e). The FDIC, RTC and RFC are all "mixed-ownership government corporations," 31 U.S.C. § 9101(2), whose accounts are kept with the Secretary of the Treasury. 31 U.S.C. § 9107(b). The obligations of the RFC, however, are not obligations of or guaranteed by the United States. 12 U.S.C. § 1441b(f)(10). In addition, any benefit from the present litigation does not inure to the benefit of the United States, but rather to those depositors having a claim against MWF. Nor will any loss in the litigation be borne by the United States. Based on the foregoing, the court concludes that RTC, like the FDIC and FSLIC, is not an integral part of the government

mechanism and thus may not invoke the federal priority statute. *See Williams*, 599 F.Supp. at 1204 (evaluating same characteristics of FSLIC to determine if it is integral part of federal government); *cf. In re Art Metal U.S.A., Inc.*, 109 B.R. 74, 79–80 (Bankr.D.N.J.1989) (examining same characteristics of Pension Benefit Guarantee Corporation to determine whether it is entitled to assert federal government's right to set off).

■ The court further finds that the cases on which LTIC relies are inapposite because they involve federally created liens arising from federal lending programs. *See E.C. Robinson Lumber Co. v. Hughes*, 355 F.Supp. 1363, 1369–70 (E.D.Mo.1972) (applying federal common law, not insolvency statute, to evaluate priority dispute involving a federal lien arising from a loan made by the Farmers Home Administration); *Bolf v. Berklich*, 401 F.Supp. 74 (D.Minn.1975) (involving loan by Small Business Association). The federal insolvency statute clearly provides priority in cases where the federal government, through one of its lending programs, loaned the money in the first instance. In *Bolf*, this court determined that the federal insolvency statute ensured the priority of only seventy-five percent of a debt, because only that portion of the loan was originally extended by SBA. The remaining twenty-five percent of the debt, although currently owed to the SBA, did not enjoy special federal priority because it was not originally a federally created lien. *Id.* at 76; *see also W.T. Jones & Co v. Foodco Realty, Inc.*, 318 F.2d 881, 889 (4th Cir.1963) (involving SBA and finding that government's "statutory priority does not attach to the 10% fractional interest" assigned to the SBA but not originally loaned by it).[20] In the present case, RTC did not loan any money to FMALP because all funds were advanced by MWF Mortgage Corporation. The court thus finds that the present case is distinguishable because it does not in-

**20.** Another case on which LTIC relies, *H.B. Agsten & Sons v. Huntington Trust & Sav. Bank*, 388 F.2d 156 (4th Cir.1967), is also distinguishable because it involves the SBA.

volve a federally created lien.[21]

Based on the foregoing, the court concludes that the federal insolvency statute does not apply to the present priority dispute.

### 2. Notice Issues Under State Law

The parties also seek rulings on various state law issues arising under the Minnesota mechanics' lien statute, which provides that:

> All such liens, as against the owner of the land, shall attach and take effect from the time the first item of material or labor is furnished upon the premises for the beginning of the improvement, and shall be preferred to any mortgage or other encumbrance not then of record, unless the lienholder had actual notice thereof.

Minn.Stat. § 514.05, subd. 1. In the present case, it is undisputed that the Ford Mall project was visibly improved before MWF's mortgage was recorded. RTC, however, seeks to avoid any loss of priority by arguing that the "actual notice" exception may apply. RTC claims that "actual notice" of the unrecorded mortgage was imparted to the lien claimants in two ways: a sign posted on the site that announced MWF's financing and the actual knowledge of the general contractor, which RTC contends should be imputed to the subcontractors. The parties ask for rulings on various issues and the court will address each in turn.

### A. Can MWF's Posted Sign Constitute Actual Notice Under the Mechanics' Lien Statute?

■ RTC contends that MWF posted a sign on the Ford Mall site that was large, obvious and stated "Financing by MWF Mortgage Corporation."[22] Various parties again ask the court to rule that the sign installed by MWF cannot constitute actual notice for purposes of determining priority under the Minnesota mechanics' lien stat-

ute. Minnesota courts have recognized that actual notice may be proven by circumstantial evidence. See, e.g., Anderson v. Iverson Outdoor Life, 187 Minn. 308, 245 N.W. 365, 366 (1932). The Anderson court directly dealt with the issue of whether a mechanics' lien claimant knew of the existence of a mortgage before the mortgage was recorded and the court held that there was sufficient evidence, although circumstantial, to sustain an inference that the lienholder had actual notice for purposes of the priority statute. Id. Minnesota courts have also determined that "knowledge of the 'mere existence' of a prior unrecorded property interest constitutes actual notice." Levine v. Bradley Real Estate Trust, 457 N.W.2d 237, 240 (Minn.Ct.App.1990) (quoting Republic Nat'l Life Ins. Co. v. Marquette Bank & Trust Co., 312 Minn. 162, 251 N.W.2d 120, 123 (1977)). As stated in its prior order, the court finds that reasonable persons could conclude that the sign was sufficient to provide actual notice of the mere existence of a mortgage by MWF and thus declines to rule as a matter of law that the sign does not provide actual notice.

### B. Should Actual Knowledge of the General Contractor be Imputed to the Subcontractors?

RTC contends that Weis Builders, the general contractor on the Ford Mall project, had actual knowledge of its mortgage interests and that the court should impute this knowledge to the lien claimants, relying on a Minnesota District Court decision which so holds. Comstock & Davis, Inc. v. G.D.S. & Assoc., No. CO–88–1632 (Washington Cty. Dist.Ct. July 18, 1989). There are no other cases resolving that issue under Minnesota law and Comstock is currently pending before the Minnesota Court of Appeals.[23] Weis Builders also denies that it had actual knowledge of the mortgage. Thus, the court

---

**21.** The mechanics' lienors also argue that the federal priority statute does not apply because the RTC acquires its interests too late in time. The court does not reach this issue because it concludes that debts owed to the RTC are not debts owed to the United States for purposes of the statute.

**22.** That sign was allegedly posted on the Ford Mall site on January 29, 1987.

**23.** The case was argued before the Minnesota Court of Appeals in November, 1991.

declines to rule that Weis Builders' knowledge should be imputed to its subcontractors.

### C. Burden of Proof Regarding the Actual Knowledge Exception

█ RTC argues that the mechanics' lienors have the burden of proof regarding whether or not they had actual notice of the existence of MWF's mortgage. The lienors contend, however, that RTC has that burden. In the absence of any case law on this issue, the court determines that the burden should be allocated as follows:

1. The mechanics' lien claimants have the burden of establishing the date on which the first visible signs of improvement occurred on the Ford Mall project.

2. As of that date, as yet to be determined, all mechanics' liens shall attach.

3. RTC, as the proponent of the actual notice exception, *see Jadwin v. Kasal*, 318 N.W.2d 844, 849 (Minn.1982) (describing "actual notice" as an "exception" to the general priority rule under Minnesota law), has the burden of proving that each individual lien claimant had actual notice of the mortgage as of the date on which the individual lienholder began his own work on the project.

4. In order to establish that an individual lienholder had actual notice, RTC shall establish a prima facie case by proving that an individual lienholder had actual knowledge of the mere existence of MWF's mortgage.[24]

5. If RTC establishes a prima facie case concerning the actual notice of an individual lien claimant, that individual claimant shall have an opportunity to present rebuttal evidence.

6. RTC, however, shall retain the burden of persuasion on the issue of actual notice.

7. If RTC successfully proves that a lien claimant had actual notice as of the day that he began work, that lien claimant loses any benefit of coordinate priority. That is, he is the exception to coordinate priority provided in Minn.Stat. § 514.05, subd. 1. Thus, any lien claimants who had actual notice at the time that they began work would lose the benefit of coordinate priority and their liens would be junior to MWF's mortgage. If otherwise valid, their liens would nonetheless still attach as of the date of the first visible sign of improvement.

8. The actual notice exception does not apply to individual lienholders who first performed work after the earliest date on which MWF's mortgage was recorded.

Based on the foregoing, IT IS HEREBY ORDERED that:

1. Neither the common law *D'Oench, Duhme* doctrine nor its statutory counterpart estops the mechanics' lienors from asserting the priority of their liens.

2. The priority dispute between the mechanics' liens and MWF's mortgage is governed by the Minnesota mechanics' lien statute rather than the federal insolvency statute.

3. The burden of proof under the Minnesota mechanics' lien statute will be allocated as set forth *infra*.

---

**24.** RTC, however, may prove such actual notice by circumstantial evidence; RTC is not required to prove that a lienholder had actual knowledge of the mortgage by means of direct or personal communication.

RTC also has the burden of proving that the person who actually received such notice, whether through MWF's sign or some other means, is one who has the requisite authority to bind his principal with that knowledge or notice. Stated differently, if the issue is whether an individual lien claimant had actual notice of the unrecorded mortgage, the knowledge of an employee or partner would not become relevant until RTC introduced evidence establishing that person's authority.