Donald D. KESSLER, Mary L. Kessler, William L. Martin, Anita M. Martin, James W. Wallace, Doris F. Wallace, Carroll W. Brockwell, Cathryn Brockwell, on their own behalf and on behalf of all others similarly situated, Plaintiffs—Appellants,

v.

NATIONAL ENTERPRISES, INC.; Arkansas No. 1, LCC, Defendants—Appellees.

No. 98–1347.

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 24, 1998.

Decided Jan. 5, 1999.

Rehearing and Rehearing En Banc Denied Feb. 9, 1999.

Jay Bequette, Little Rock, AR, argued (Don M. Schnipper, on the brief), for appellant.

A.J. Kelly, Little Rock, AR, argued (Joel Taylor, on the brief), for appellee.

Before BOWMAN, Chief Judge, LOKEN and KELLY,* Circuit Judges.

LOKEN, Circuit Judge.

In the mid–1980s, developer Hansen, Hooper & Hayes, Inc. ("the Developer"), sold time-share interests in resort condominiums in Hot Springs, Arkansas. The Developer financed the development with a loan from Independence Federal Bank ("the Bank"), secured by a first mortgage on the Developer's interest in the condominium properties. The Bank was later taken over in receivership by the Resolution Trust Corporation ("RTC"). RTC purchased the Developer's note and mortgage, the Developer defaulted on the note, and RTC commenced foreclosure proceedings. RTC then sold the note and mortgage to National Enterprises, Inc. ("NEI"). In April 1994, NEI purchased the mortgaged property at the foreclosure sale.[1]

Access to the condominium properties is controlled by an adjacent hotel. The Developer negotiated a license agreement with the hotel owner and represented to condominium purchasers that they would enjoy permanent access to their properties through the hotel property, and that the hotel owner would furnish a utilities easement for electricity, water, and telephone and would let them use hotel facilities such as parking, swimming pools, tennis court, and an exercise room. In December 1993, the hotel was sold in foreclosure. Its new owner notified condominium owners that access and the above-mentioned amenities were no longer available. Without

---

* The HONORABLE JOHN D. KELLY passed away on October 21, 1998. This opinion is consistent with his tentative vote at the panel's conference following oral argument on September 24, 1998.

1. NEI later transferred its interest in the properties to appellee Arkansas No 1, LLC. That transfer is not at issue, and these parties have common interests in the appeal, so further references to NEI in this opinion will include Arkansas No. 1, LLC.

access, parking, and utilities, the condominiums are essentially worthless.

Attempting to make good on the Developer's promises to condominium owners, NEI sought to enforce the hotel license agreement in state court. In August 1994, the Garland County Chancery Court ruled that the license agreement did not survive the hotel's foreclosure. Unable to use their properties, a group of condominium owners filed this suit in state court against NEI, as alleged successor to the Developer, seeking rescission of their time-share purchase agreements. NEI removed the case, as there is complete diversity, and moved for summary judgment. The district court granted that motion, concluding plaintiffs' claims are barred by *D'Oench, Duhme & Co. v. FDIC*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), and its statutory counterpart, 12 U.S.C. § 1823(e). Plaintiffs appeal. Concluding *D'Oench* was preempted by § 1823(e) and this situation is beyond the reach of that statute, we reverse.

In *D'Oench*, the Belleville Bank & Trust Company persuaded its securities broker, D'Oench, Duhme & Co., to sign a note payable to the bank. D'Oench, Duhme received no loan proceeds. Instead, it was given a receipt stating: "This note is given with the understanding it will not be called for payment. All interest payments to be repaid." That understanding was not reflected in the bank's records. Rather, the note was reported as an unimpaired asset, effectively masking the bank's losses in defaulted bonds previously purchased from D'Oench, Duhme. The bank failed, and the FDIC acquired the note and sued for nonpayment. D'Oench, Duhme asserted lack of consideration as a defense. Applying federal common law derived from the policies of the Federal Reserve Act, the Supreme Court held that D'Oench, Duhme was estopped to assert a defense based upon a secret understanding intended to deceive bank examiners and the FDIC as to the solvency of the failed bank.

■ In the Federal Deposit Insurance Act of 1950, Congress drew on the *D'Oench* common law doctrine in enacting what is now 12 U.S.C. § 1823(e). *See Langley v. FDIC*, 484 U.S. 86, 92–93, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987); *Hanson v. FDIC*, 13 F.3d 1247, 1250–

51 (8th Cir.1994). In the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA), Congress broadened § 1823(e) to protect assets acquired by the FDIC as receiver for a failed bank. In *DiVall Insured Income Fund Limited Partnership v. Boatmen's First National Bank of Kansas City*, 69 F.3d 1398, 1402 (8th Cir. 1995), we held that FIRREA as construed in *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994), preempted the common law *D'Oench* doctrine. Therefore, the district court erred in relying on *D'Oench* in dismissing plaintiffs' claims. The relevant issue is whether those claims are barred by § 1823(e).

■ The RTC is protected by § 1823(e) to the same extent as the FDIC. *See* 12 U.S.C. § 1441a(b)(4)(A). Section 1823(e) presently provides in relevant part:

> No agreement which tends to diminish or defeat the interest of the [RTC] in any asset acquired by it ... as receiver of any insured depository institution, shall be valid against the [RTC] unless such agreement—
>
> (1) is in writing,
>
> (2) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,
>
> (3) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board committee, and
>
> (4) has been, continuously, from the time of its execution, an official record of the depository institution.

NEI argues the statute bars plaintiffs' claims because (1) plaintiffs seek to rescind agreements with the Developer based upon the alleged failure of the Developer (and its successors in interest) to satisfy a contractual obligation to provide access and hotel amenities, and (2) plaintiffs' claims, if successful, will diminish the value of an asset acquired

by the RTC as receiver,[2] namely, in the words of NEI's brief, "the value of the unsold timeshare units upon which the RTC was in the process of foreclosing at the time of the sale of the Note and Mortgage to NEI." We reject this contention, concluding instead that plaintiffs' claims are beyond the bar of § 1823(e).

The statute applies to claims that are based upon an agreement which "tends to diminish ... the interest of the [RTC] in any asset acquired by it ... as receiver." Here, RTC acquired assets of the Bank that included the Developer's note and as-yet-unforeclosed mortgage. The interest RTC acquired through the mortgage was a security interest in the Developer's collateral. That security interest has not been diminished—for example, by an undisclosed superior lien—and it cannot be diminished by plaintiffs' claims. The foreclosure has been completed by NEI, and NEI as successor creditor to the Bank and RTC received precisely what the mortgage promised—the foreclosure proceeds when NEI purchased the collateral at the foreclosure sale. RTC did not acquire the underlying asset, the Developer's ownership interest in the collateral. Therefore, whether the value of *that* asset has been or will be "diminished" by claims based upon transactions or agreements between the Developer and third parties that did not affect the security interest of the Bank as mortgagee is beyond the purview of § 1823(e). Though based upon the plain language of the statute, this conclusion is entirely consistent with the history and purpose of the *D'Oench* common law doctrine that § 1823(e) has replaced. NEI has not cited, and we have not found, any case applying *D'Oench* or the statute to a non-banking agreement that diminished the underlying value of a bank's collateral but did not affect the bank's security interest in that collateral.

■ *D'Oench* and § 1823(e) were intended to protect bank examiners and the FDIC and RTC as receivers from covert agreements not appearing in the bank's records, and to encourage prudent lending and proper recordation of banking transactions. *See Community Bank of the Ozarks v. FDIC*, 984 F.2d 254, 256 (8th Cir.1993). *D'Oench* involved a bank customer that knowingly helped the bank hide its distress with a phony asset. The doctrine was logically expanded to include secret agreements with more innocent bank customers because a borrower is able to insist that the full scope of its contemporaneous understanding with the bank be in writing and be properly approved by the bank's lending officers and reflected in the bank's official records. *See Langley*, 484 U.S. at 94, 108 S.Ct. 396. But it is not realistic to apply the bar of § 1823(e) to non-banking transactions or other types of agreements which would not customarily be "scrutinized, approved, and recorded by the bank's executive committee or board." *Alexandria Assocs., Ltd. v. The Mitchell Co.*, 2 F.3d 598, 603 (5th Cir.1993). When a bank acquires a note and mortgage, any agreement establishing the bank's security interest is scrutinized, approved, and recorded by the bank's authorized lending officers, but the many agreements between the borrower and third parties that might affect the value of the underlying collateral are not subjected to this formal process. For example, if a bank takes a security interest in an on-going retail sales business, the value of the collateral might well be diminished by the company's prior breaches of sales warranties, but if the bank failed and RTC took it over, it would be preposterous to assert that § 1823(e) bars consumer claims because those warranties were not reflected in the Bank's loan records. Thus, limiting the scope of § 1823(e) to its plain language in this situation is eminently sensible.

In this case, NEI argues that § 1823(e) bars claims by parties who dealt with the Bank's customer, the Developer, rather than the Bank itself. There was nothing secret about plaintiffs' dealings with the Developer as owner of the Bank's collateral. Indeed,

**2.** The district court concluded that NEI as successor to the RTC is entitled to the protections of § 1823. Plaintiffs do not challenge that ruling on appeal, and we do not consider the issue. *Compare FDIC v. Newhart*, 892 F.2d 47, 49–50 (8th Cir.1989), *with Federal Fin. Co. v. Hall*, 108 F.3d 46, 49–50 (4th Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 157, 139 L.Ed.2d 102 (1997), *and DiVall*, 69 F.3d at 1401–02.

the success of the Developer's development, and therefore its ability to repay its note to the Bank, turned on the Developer's ability to sell time-share units. To this end, the mortgage expressly acknowledged the Developer's intent to sell off portions of the mortgaged property as time-share units, and it provided that the Bank's interest as mortgagee would be subordinate to the rights of time-share purchasers so long as the Developer paid a predetermined "release price" to the Bank at the time of purchase. Moreover, the time-share development was comprehensively regulated under the Arkansas Time–Share Act, ARK.CODE ANN. §§ 18–14–101 *et seq.*, and the Developer's representations to time-share purchasers regarding access and hotel amenities were set forth in a Public Offering Statement filed with the Arkansas Real Estate Commission. Thus, like the mechanic's lien at issue in *Bateman v. FDIC*, 970 F.2d 924, 928 (1st Cir.1992), plaintiffs' ownership interests "are not the *kinds* of interests that the FDIC examiner need (or would) necessarily rely upon the bank's documents to reflect. Such interests are not those *of* the bank; they are not contained in documents filed *with* the bank. Nor are they otherwise difficult to find." *Accord RTC v. Ford Mall Assocs. Ltd. Partnership*, 796 F.Supp. 1233, 1239 (D.Minn.1992). Plaintiffs' claims for rescission, if successful, would have *expanded* the Bank's security interest in the collateral prior to foreclosure, but they now threaten to diminish the overall value of that collateral after foreclosure by the Bank's successor creditor. At bottom, neither the *D'Oench* doctrine nor the statute "fit" this situation. *Compare Thigpen v. Sparks*, 983 F.2d 644, 647–49 (5th Cir.1993). In these circumstances, we have no difficulty concluding that neither the plain language of § 1823(e), nor the purpose of that statute as derived from the common law *D'Oench* doctrine, bars plaintiffs' claims against NEI as foreclosure sale purchaser.

Having concluded that neither 12 U.S.C. § 1823(e) nor the common law *D'Oench* doctrine affords NEI a defense to plaintiffs' claims, we need not consider plaintiffs' alternative argument that NEI is barred by principles of res judicata and collateral estoppel from raising these defenses because it failed to raise them in prior state court litigation with other time-share purchasers. NEI alternatively argues that plaintiffs' claims are barred by laches and the applicable statute of limitations. These issues must be addressed in the first instance by the district court. Accordingly, the judgment of the district court is reversed and the case is remanded for further proceedings not inconsistent with this opinion.